*Decision will be entered under Rule 50.*

AUTOMOBILE CLUB OF MICHIGAN, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 27988.  Promulgated September 23, 1953.

*Raymond H. Berry, Esq.*, and *A. H. Moorman, Jr., Esq.*, for the petitioner.

*A. J. Friedman, Esq.*, and *Charles Speed Gray, Esq.*, for the respondent.

WITHEY, *Judge:* The respondent determined deficiencies in the petitioner's income and excess profits taxes as follows:

| | Deficiencies | |
| Year | Income tax | Excess profits tax |
|---|---|---|
| 1943 | $49,016.97 | $128,953.72 |
| 1944 | 48,781.99 | 157,307.29 |
| 1945 | 42,373.66 | ---------- |
| 1946 | 13,645.94 | ---------- |
| 1947 | 7,365.87 | ---------- |

The principal issues are the correctness of the respondent's action (1) in determining that the years 1943 through 1947 the petitioner was not exempt from income and excess profits taxes, as a club organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, within the purview of section 101 (9) of the Internal Revenue Code, (2) in determining that the period of limitations for assessment of tax for 1943 and 1944 had not expired at the time of mailing of the deficiency notice, (3) in determining that the entire amount of membership dues received by petitioner during each of the years 1943 through 1947 is to be included in income for the year in which received, and (4) in determining the deductions allowable as depreciation or amortization for the years 1943 through 1947. The parties are agreed that all other issues have been disposed of by stipulation or will be disposed of by our decision of the above-stated issues.

## GENERAL FINDINGS OF FACT.

A portion of the facts has been stipulated and is found accordingly.

The petitioner is a Michigan corporation and has its office and principal place of business in Detroit. It filed its income tax returns, excess profits tax returns, and declared value excess-profits tax returns for the years 1943 through 1947 with the collector for the district of Michigan.

### *Issue 1. Exemption From Taxation.*

#### FINDINGS OF FACT.

On July 21, 1916, the petitioner was incorporated under the laws of the State of Michigan under the name of Detroit Automobile Club for a term of existence of 30 years. It assumed its present name in 1930 and in 1946 its existence was extended for a further period of 30 years. The petitioner was organized as a nonprofit corporation without capital stock or shares and has never paid any dividends.

As set forth in petitioner's articles of association and its bylaws, as they existed on January 1, 1940, the purposes or objects of the petitioner were as follows:

To promote and foster the healthy growth of the automobile industry; to secure the adoption and enforcement of reasonable and useful traffic ordinances and motor vehicle laws; to promote the establishment and construction of permanent highways for traffic; to interest automobile owners and drivers in the principles of "Safety First" as applied to automobile traffic; to promote touring and to obtain and furnish touring information and obtain the necessary signboarding of public highways; and to co-operate in any work or movement which may tend to benefit the automobile driver, user, owner or manufacturer, and the automobile industry in general.

In January 1941 the petitioner's bylaws were amended to provide that petitioner's funds should be used only to accomplish the foregoing purposes or objects of the petitioner.

The petitioner's board of directors has general charge of management and control of the petitioner's affairs and its funds and property. The board is elected annually and its members serve without pay. The functions of the petitioner are carried out by its officers and employees under the direction of the board of directors.

During the years involved herein until May 1947 the petitioner had three classes of membership, namely, honorary, life, and active. Honorary membership was limited to 25 in number and includes certain Government officials and other persons named by the board of directors. Honorary members pay no dues and have no voting rights. Life membership is obtained by an active member paying $250 at one time. Life members are exempt from the payment of future dues and assessments but continue to have all the rights of active members.

Active memberships are open to persons (male or female) of good moral character over 16 years of age. In May 1947 the bylaws were amended to provide that any person, wife, son, or daughter, domiciled in the home of an active member might become an associate member and that such memberships should run concurrently with the active membership with which it was associated.

The petitioner had no entrance fee but its dues for active members were $10 annually, except that effective October 1, 1946, they were increased to $12 annually.

To persons soliciting members the petitioner paid $2.50 for each new member obtained.

The number of members belonging to the petitioner during the indicated years were as follows:

| | |
|---|---|
| 1943 | 212,865 |
| 1944 | 224,092 |
| 1945 | 243,630 |
| 1946 | 261,695 |
| 1947 | 244,994 |

Petitioner's bylaws provide for annual meetings of its members. Until some undisclosed time prior to March 15, 1947, twenty-five members constituted a quorum. Effective March 15, 1947, 10 per cent of petitioner's membership was required to constitute a quorum.

During 1943 through 1947 the petitioner devoted most of its resources and efforts to the bettering of conditions for motorists and the promotion of proper laws relating to the use of the motor car, the promotion of travel, and the use of the automobile for other modes of transportation. It engaged in the promotion of safety, the solution of traffic problems, and the promotion of the formation of schoolboy patrols. It organized the schoolboy patrols in Michigan. To teachers in the schools it furnished textbooks dealing with the conduct and operation of schoolboy patrols. As a reward it annually took some of the patrol boys to Washington, D. C. Annually it conducted seminars in the University of Michigan to promote the education of schoolteachers in the state in driver training courses. Petitioner's safety and traffic and engineer departments made surveys throughout the State of Michigan at the request of various cities and communities and many of its proposals as to safety measures were adopted. Petitioner supplied to its members in Michigan and those affiliated with the American Automobile Association emergency road service. The petitioner published and furnished to each of its active members a magazine containing news about travel and news about laws as they pertain to the use of automobiles. Maps and other touring information with reference to road conditions were also provided, as was assistance to the American Automobile Association in its designation or appoint-

ment of proper places for tourists to be housed and fed. The petitioner secured reservations for its members when traveling abroad and arranged for the shipping of their cars abroad. Petitioner also promoted and furnished gratis to various communities proper directional and stop signs. In its services the petitioner attempted to do for the motorist in a collective way that which he was unable to do as an individual.

The petitioner does not engage in or conduct any social activities.

During the early part of 1934, the petitioner inquired of respondent as to whether it was exempt from payment of the capital stock tax imposed by section 215 of the National Industrial Recovery Act. The respondent informed petitioner that in order to determine whether it was entitled to exemption from payment of the capital stock tax he must first determine whether the petitioner was entitled to exemption from Federal income taxation under the provisions of section 103 of the Revenue Act of 1932. Accordingly, respondent requested petitioner to supply certain information concerning its operations, a copy of its financial statement for 1933 showing assets and liabilities, and a classified list of its receipts and disbursements. The petitioner replied by letter and enclosed therewith a balance sheet showing its assets and liabilities as of April 30, 1934.

On June 11, 1934, the respondent wrote the petitioner advising it that on the basis of evidence submitted it was held that petitioner was entitled to exemption under the provisions of section 103 (9) of the Revenue Act of 1932 and the corresponding sections of prior revenue acts; that, therefore, it was not required to file returns for 1933 and prior years; and that under the provisions of section 101 (9) of the Revenue Act of 1934 it would not be required to file returns so long as there was no change in its organization, its purposes, or methods of doing business. The petitioner was further advised that the exemption thereby granted did not apply to taxes levied under other titles or provisions of the respective revenue acts, except insofar as exemption was granted expressly under those provisions to organizations enumerated in section 103 of the Revenue Act of 1932.

In September 1937, the respondent sent petitioner a questionnaire and requested it to supply certain information concerning its claim for exemption under section 101 (9) of the Revenue Act of 1936. The petitioner filled in the questionnaire and returned it to the respondent with a letter and a copy of its financial statement as of December 31, 1936. On July 5, 1938, the respondent wrote petitioner advising that since it appeared that there had been no change in its form of organization or activities which would affect its status, the previous ruling of the Bureau holding it to be exempt from filing returns of income was affirmed under the Revenue Act of 1936.

On May 12, 1945, respondent wrote the petitioner stating that the Bureau of Internal Revenue was reconsidering the question of the exemption of automobile associations from Federal income taxation in the light of the opinion of the Chief Counsel of the Bureau of Internal Revenue in regard thereto as set forth in G. C. M. 23688, C. B. 1943, page 283. Petitioner was requested to furnish the information called for in the form of a blank exemption affidavit which was enclosed. By letter dated June 11, 1945, the petitioner replied to the respondent's request and enclosed therewith the executed exemption affidavit together with a copy of petitioner's articles of incorporation and bylaws and a copy of its balance sheet as at December 31, 1944.

The respondent wrote the petitioner on July 16, 1945, as follows:

Reference is made to the information submitted by you for use in determining your status for Federal income tax purposes in view of the opinion expressed in G. C. M. 23688, C. B. 1943, 283.

Under date of June 11, 1934 you were held entitled to exemption from Federal income tax under the provisions of section 103 (9) of the Revenue Act of 1932 and the corresponding provisions of prior revenue acts, which ruling was affirmed July 5, 1938, under the provisions of the Revenue Act of 1936.

The information recently submitted by you shows that your activities consist of providing travel information and service, rendering emergency road service, publishing the Motor News, locating automobile parts for members' cars to keep them in service, providing safety education in public and parocial [sic] schools, organizing and equipping school patrols and providing traffic surveys for Michigan cities in the interest of safety. Your income is derived from membership dues, interest on investments, and advertising in the Motor News. It is expended for rendering services to your members.

Section 101 (9) of the Internal Revenue Code provides for the exemption of:

"Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder."

Prior revenue acts carry similar provisions.

This office holds that the term "club" as used in the above section of law contemplates commingling of members, one with the other in fellowship. Thus, an organization should be so composed and its activities be such that fellowship among the members plays a material part in the life of the organization in order for it to come within the meaning of the term "club".

The evidence submitted shows that fellowship does not constitute a material part of the life of your organization and that your principal activity is the rendering of commercial services to your members.

It is, accordingly, held that you are not a club "organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes", within the meaning of section 101 (9) of the Internal Revenue Code or the corresponding sections of prior revenue acts, and, therefore, are not entitled to exemption under those sections. Furthermore, there is no other provision of law under which an organization of your character can be held to be exempt from Federal income tax.

Bureau rulings of June 11, 1934 and July 5, 1938 are hereby revoked.

In view of all the facts and circumstances in your case it is held, with the approval of the Secretary of the Treasury, that you will not be required to file

income tax returns for years beginning prior to January 1, 1943. You are, however, required to file returns for the year 1943 and subsequent years.

Thereafter the petitioner filed income and excess profits tax returns for the calendar years 1943 and 1944 under protest on the ground that it was exempt from tax.

### OPINION.

In its petition, the petitioner assigned as error the respondent's determination that it was not exempt from tax for the years 1943 through 1947 under the provisions of section 101 (9) of the Internal Revenue Code.[1] On brief, petitioner states that in view of the decisions in *Chattanooga Automobile Club*, 12 T. C. 967, affd. 182 F. 2d 551; *Keystone Automobile Club*, 12 T. C. 1038, affd. 181 F. 2d 402; and *Automobile Club of St. Paul*, 12 T. C. 1152, it concedes that it was not exempt from tax for taxable years ending after July 16, 1945, the date on which the respondent revoked his previous rulings holding that petitioner was exempt from tax. The petitioner makes no contention that during 1943 and 1944 it was in fact and in law an organization of the class contemplated by section 101 (9) of the Code and as such was exempt from taxation for those years. Therefore, we must assume that during those years the petitioner was not an exempt organization under the provisions of that section. However, on other grounds, the petitioner contends that by having established its tax-exempt status in the manner provided by respondent's regulations, and there having been no change in its character, it is entitled under the law to retain its established tax-exempt status for all taxable years ending before the year in which the respondent revoked his prior rulings as to its status. The grounds so relied on are that respondent's rulings of June 11, 1934, and July 5, 1938, show that it had established its right to exemption; that under the respondent's regulations,[2] relating to section 101 of the Code when it estab-

---

[1] SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.
The following organizations shall be exempt from taxation under this chapter—

\* \* \* \* \* \* \*

· (9) Clubs organized and operated exclusively for pleasure, recreation, and other nonprofitable purposes, no part of the net earnings of which inures to the benefit of any private shareholder ;.

[2] Regulations 103, sec. 19.101–1. \* · \* \*

\* \* \* \* \* \* \*

When an organization has established its right to exemption, it need not thereafter make a return of income or any further showing with respect to its status under the law, unless it changes the character of its organization or operations or the purpose for which it was originally created. \* \* \* Collectors will keep a list of all exempt corporations, to the end that they may occasionally inquire into their status and ascertain whether or not they are observing the conditions upon which their exemption is predicated.

\* \* \* \* \* \* \*

All the regulations from Regulations 33, issued under the Revenue Act of 1916, to Regulations 103, issued under the Code, have contained provisions substantially identical with the foregoing.

lished its right to exemption it was not thereafter required to make a return of income or any further showing with respect to its status unless it changed its organization, operations, or purposes for which created and that no such changes occurred; that under the principle applied in *Helvering* v. *R. J. Reynolds Tobacco Co.*, 306 U. S. 110, the foregoing regulations having been of long standing acquired the force and effect of law by reason of the successive reenactments in the various revenue acts and the Code of provisions corresponding to section 101 of the Code; and that, accordingly, respondent's authority to revoke his prior rulings did not extend to a taxable year prior to that in which the revocation is made where the revocation is not based on a change made by the taxpayer in its organization, operations, or purpose of creation.

The petitioner's contentions present the question of whether the regulations relied on by petitioner were intended to have the meaning attributed to them by the petitioner. In *Southern Maryland Agricultural Fair Association*, 40 B. T. A. 549, we had occasion to consider the meaning and effect of such regulations. In that case the Commissioner issued a ruling in 1924 holding that the taxpayer was exempt from tax. Believing that the ruling relieved it from the duty of filing returns, the taxpayer did not file any returns for the years 1923 through 1935. Early in 1937 the Commissioner reversed the ruling made in 1924 and held that the taxpayer was not and never had been exempt and notified the taxpayer accordingly. He also determined deficiencies against the petitioner for the years 1921 through 1935. There the applicable regulations as to corporations establishing exemption and the lack of necessity thereafter for filing returns were substantially the same as the regulations involved here. Two questions were presented, namely, whether the 1924 ruling and the applicable regulations excused the taxpayer from filing returns for the years 1923 through 1935 and whether the Commissioner had authority to reverse the 1924 ruling. In deciding both questions adversely to the taxpayer, we stated that although the Commissioner could not change the law by regulations, he could make reasonable regulations to assist him in administering the act and deciding whether a particular corporation was or was not exempt by statute. We concluded that was what he had done by the regulations there involved and held that such regulations were intended to be and were administrative, not legislative. Further, we stated that the inference should not be drawn from the regulations that the respondent thereby intended to write into the limitation provisions of the revenue acts words which would provide a different period of limitations from that provided in the revenue acts for the benefit of those corporations which he might erroneously conclude were exempt. We held that the Commissioner could not thus change the law if he so desired.

Considering the petitioner's contentions here in the light of what was said in the *Southern Maryland Agricultural Fair Association* case, we must conclude that the regulations here relied on were not intended to, and did not, in any way modify or change the provisions of the revenue acts and the Code relating to exempt organizations. Organizations that were actually exempt were made so by the provisions of the revenue acts and the Code. They were not required to file any returns and the Commissioner could not change their status by regulations. Organizations not coming within the provisions of the revenue acts and the Code relating to exempt organizations were not exempt and the regulations in question neither purported to. nor could, make them exempt.

In the *Reynolds Tobacco Co.* case, the question for decision was whether gain accruing to a corporation from the purchase and resale of its own shares constituted gross income within the meaning of section 22 (a) of the Revenue Act of 1928. Under the Revenue Act of 1928, the Commissioner issued a regulation to the effect that a corporation realized no gain or loss from the purchase or sale of its own stock. At least from 1920 such administrative construction was uniform with respect to each of the revenue acts from that of 1913 through 1932. In May 1934 the regulation was amended to provide that where a corporation deals in its own shares as it might in the shares of another corporation, the resulting gain or loss was to be computed in the same manner as though the corporation were dealing in the shares of another. In 1929 the taxpayer sold certain of its shares acquired in that and prior years for a sum which exceeded cost. The Court concluded that since successive revenue acts had reenacted without alteration the definition of gross income as it stood in the acts of 1913, 1916, and 1918, Congress must be taken to have approved the administrative construction represented by the earlier regulation and thereby to have given it the force of law. Accordingly, the Court held that the amended regulation was not to be applied retroactively and that the taxpayer's tax liability for 1929 was to be determined under the regulation in force in 1929.

Clearly the situation here is different from that presented in the *Reynolds Tobacco Co.* case. The regulations involved there were legislative in nature in that they purported to determine what did or did not constitute gain or loss. The regulations here involved were administrative in character and in nowise purported to determine whether any organization was or was not exempt. Accordingly, the holding in the *Reynolds Tobacco Co.* case does not have here the effect contended for by petitioner.

The petitioner also has made some argument to the effect that it has been discriminated against by the respondent in that here the re-

spondent has determined deficiencies against it for the years 1943 and 1944 when notice of revocation of respondent's ruling of exemption was not sent until during 1945, whereas in the case of all other automobile clubs, the respondent has not determined a deficiency for any year earlier than that in which notice of revocation of his ruling of exemption was sent. So far as appears from the reports of the cases mentioned in this connection by petitioner, the respondent has made all revocations of his rulings of exemption effective for the taxable years, calendar or fiscal, beginning in 1943. Since the respondent has not determined a deficiency against the petitioner for any year earlier than the calendar year 1943, we cannot find that petitioner has been discriminated against.

The respondent is sustained on this issue.

### *Issue 2. Period of Limitations.*

#### FINDINGS OF FACT.

On August 12, 1944, the petitioner filed with the collector for the district of Michigan, for the calendar year 1943, Treasury Department Form 990, an annual return which section 54 (f) of the Internal Revenue Code[3] required should be filed by organizations exempt from income tax under section 101 of the Internal Revenue Code, or under corresponding provisions of prior revenue acts. On May 17, 1945, the petitioner filed a like form for the calendar year 1944. The foregoing returns showed gross income and receipts and disbursements and contained statements of assets and liabilities at the end of the respective years. Such returns were not the returns required by section 52 (a) of the Code from corporations subject to tax under Chapter 1 of the Code and did not provide sufficient data from which the petitioner's income and excess profits tax liability for 1943 and 1944 could be computed and assessed.

The petitioner's income and excess profits tax returns (Forms 1120 and 1121) for the calendar years 1943 and 1944 were filed on October 22, 1945. On August 25, 1948, petitioner and the respondent entered into consents which provided that the amounts of any income, excess profits or war profits taxes due for the taxable years ended December 31, 1943, and December 31, 1944, could be assessed at any time on or before June 30, 1949. On May 23, 1949, they executed consents which provided that such taxes for said years could be assessed at any time on or before June 30, 1950. The notice of deficiency forming the

---

[3] Section 54 (f) was added to the Code by section 117 of the Revenue Act of 1943 and was made applicable for taxable years beginning after December 31, 1942.

basis of this proceeding was mailed to the petitioner on February 20, 1950.

OPINION.

The petitioner contends that even if it be determined that the respondent had authority to determine deficiencies against it for 1943 and 1944, we must conclude that the notice of deficiency was not sent within the applicable periods of limitations and that assessments of the deficiencies for those years are barred because the periods of limitations began to run prior to the filing of the income and excess profits tax returns on October 22, 1945. The petitioner concedes that under section 275 (a) of the Code[4] the period of limitations begins to run from the filing of the return. However, it contends that where a taxpayer is not under a duty to file a return for a given year, the period of limitations for such year begins to run from the date the return should have been filed if there had been a duty to file it. In support of its position the petitioner relies on *Balkan Nat. Ins. Co.* v. *Commissioner*, 101 F. 2d 75, and *Stockstrom* v. *Commissioner*, 190 F. 2d 283.

In the *Balkan Nat. Ins. Co.* case, the Alien Property Custodian seized all of the records of a foreign corporation prior to the time the return for 1918 was due and the records were never returned to the corporation. The corporation never filed any return. It was held that the statute had run in 1934 against assessment of a deficiency for 1918 since the Government had made it impossible for the corporation to file any return for 1918. Obviously the present case is not like that case nor is it as strong factually for the taxpayer. The petitioner at all times was in possession of its records. In the *Stockstrom* case, the donor of gifts to trusts filed a gift tax return for 1936 and paid the tax thereon computed in accordance with the Commissioner's then outstanding ruling as to exclusions for gifts to trusts. Thereafter in 1937, and on the basis of certain court decisions, the Commissioner reversed his ruling as to exclusions for gifts to trusts. On the basis of the new ruling the respondent refunded the donor's gift tax paid for 1936 and approved the exclusions taken, on the basis of the new ruling, in the donor's 1937 gift tax return. On the basis of the new ruling, the donor was not liable for gift tax for 1938 and filed no return for that year. In 1941 a revenue agent obtained the facts and figures as to gifts made to trusts in 1938. He and another

---

[4] SEC. 275. PERIOD OF LIMITATION UPON ASSESSMENT AND COLLECTION.
Except as provided in section 276—
(a) GENERAL RULE.—The amount of income taxes imposed by this chapter shall be assessed within three years after the return was filed, and no proceeding in court without assessment for the collection of such taxes shall be begun after the expiration of such period.

employee of the Bureau considered the liability of the donor for gift tax for 1938 and the donor was informed that there was no liability. In 1948, and on the basis of a Supreme Court decision rendered in March 1941, the respondent reversed his 1937 ruling and determined a deficiency in gift tax for 1938. The Court concluded that when the facts and figures as to the donor's gifts in 1938 were obtained in 1941, it was the collector's duty promptly to file a return for the donor for 1938, that such duty should not have been postponed for years in order to prevent the statute of limitations from running and held that assessment of the deficiency was barred. Clearly the instant case is distinguishable on its facts from the *Stockstrom* case.

Here, the respondent on July 16, 1945, and in the same notice in which he determined that the petitioner was not exempt from tax and in which he revoked his prior rulings, requested the petitioner to file income tax returns for 1943 and 1944. So far as shown no revenue agent or other employee of the Bureau theretofore had made an investigation of the petitioner's affairs and obtained from petitioner data upon which to compute its income tax liability for those years.

Because of factual differences we are unable to find that the decisions in the *Balkan Nat. Ins. Co.* and *Stockstrom* cases are applicable here.

In *Southern Maryland Agricultural Fair Association, supra*, we considered the question of whether an erroneous ruling by respondent (subsequently revoked) that a corporation was exempt from tax was effectual, with respect to taxable years prior to that of revocation, for starting the running of the statutory period of limitations and held that it was not. We think our holding there is applicable here.

The petitioner further urges that the periods of limitations began to run for 1943 and 1944 when it filed Forms 990 for the respective years. It contends that such forms contained sufficient data from which its income and excess profits tax liability for such years could be computed and assessed and that, consequently, such forms are to be considered as the returns contemplated by section 275 (a) of the Code. From a comparison of Forms 990 filed by the petitioner for 1943 and 1944 with the income and excess profits tax returns filed for those years, we have found that the Forms 990 do not contain sufficient data from which the petitioner's income and excess profits taxes for those years could be computed and assessed. In a similar situation in *John Danz*, 18 T. C. 454 (on appeal, C. A. 9), we held that the Forms 990 were not sufficient to start the running of the period fixed by section 275 (a) of the Code for assessment and collection of the tax due. On authority of our holding there, the contention of the petitioner is denied.

*Issue 3.   Inclusion of Membership Dues in Income.*

FINDINGS OF FACT.

The petitioner collected dues from its members in the following amounts during the indicated years:

| | |
|---|---:|
| 1943 | $2,126,437.50 |
| 1944 | 2,237,017.04 |
| 1945 | 2,430,543.97 |
| 1946 | 2,744,897.65 |
| 1947 | 2,914,028.76 |

The money collected by petitioner from its members as dues was deposited by it in a general bank account which it maintained with the National Bank of Detroit.   This was an account in which all money received by petitioner was deposited.   At no time was the money received by petitioner as dues segregated from its general funds or deposited in a bank account other than the one general account in which all of its other receipts were deposited.

Upon receipt of a member's dues, the petitioner set aside $1 to pay for a subscription to a magazine called "Motor News."   If the member were a new member and had been brought in by one of petitioner's solicitors or employees a commission of $2.50 was paid to the person bringing in the member.

Prior to March 15, 1947, petitioner's bylaws provided that a member whose annual dues remained unpaid for 30 days after becoming due was subject to suspension from the privileges offered by petitioner.   If a member failed to pay his dues within 30 days after notice of his suspension, he ceased to be a member of petitioner and became liable for the payment of 2 months' dues as well as the expense of collecting them.   Any member who resigned forfeited all his rights and interests in the petitioner's property and assets.   A new bylaw effective March 15, 1947, provided for the termination of membership by death, resignation, nonpayment of dues, or upon other reasonable cause by written notice to the member, or upon order of petitioner's board of directors, and for the sending by petitioner with the notice of termination a check for the unused portion of annual dues as determined by petitioner's board of directors.   Petitioner's board of directors has never adopted a resolution fixing the amount, or providing a formula for ascertaining the amount, of a refund to be paid to persons who ceased to be members of the petitioner.

Although prior to March 15, 1947, the petitioner's bylaws did not provide for the refunding of a portion of annual dues upon the termination of a membership, it had been petitioner's policy since about 1924 to refund a portion of the unearned dues upon the termination

of a membership. However, there was no "iron-bound" rule under which the amounts of such refunds were computed.

Membership dues are paid in advance for 1 year. When a member's dues are received, the petitioner credits the amount thereof to an account carried as a liability account and designated "Unearned Membership Dues." During the first month of membership and each of the following 11 months, one-twelfth of the amount paid is credited to an income account designated "Membership Income." The foregoing method of accounting with respect to membership dues has been followed by petitioner since 1934 and the income from membership dues reported by petitioner in its returns for 1943 through 1947 was ascertained by petitioner under that method.

The petitioner's returns for each of the years 1943 through 1947 were prepared on the basis of a calendar year and on the accrual method of accounting.

The respondent determined that the entire amount of membership dues received by petitioner during the years involved herein should be reported as income for the year in which received.

OPINION.

Under the method employed by petitioner in accounting for, and reporting, income from membership dues, such dues are treated as earned ratably over the period of the membership and each month one-twelfth of a member's annual dues is included in petitioner's income as representing income actually earned. That portion of a member's dues received in a given taxable year which, under the petitioner's method, is not included in income for the year in which received, is deferred and included in income in the following year. The respondent determined that the entire amount of membership dues received during a taxable year is to be included and reported in income for the year in which received. In effect the petitioner claims that because the income as determined by respondent embraces unearned income and also embraces receipts which may subsequently be subject to refund, the respondent's determination fails properly to reflect income.

In *Brown* v. *Helvering*, 291 U. S. 193, affirming 22 B. T. A. 678, the taxpayer was a general insurance agent and kept books on the accrual basis. During the taxable years there involved the tax-payer received, without restrictions as to their use and disposition by it, commissions on fire insurance policies written for 1-, 3-, and 5-year terms. It was held that the entire amount of commissions received in the respective taxable years constituted income to the taxpayer for the years in which received even though they were

received before they were earned and some portion of them might have to be refunded in the future.

In *South Tacoma Motor Co.*, 3 T. C. 411, a taxpayer on the accrual basis attempted to defer certain sums received from the sale of coupon books which entitled the purchaser to services which might be demanded and performed after the year of sale, and reported as gross income only that portion of the sums received which was allocable to the services performed during the taxable year. In support of its deferment of income the taxpayer contended that the nature of its contract was such that it would have to perform many of the services required by the contract subsequent to the taxable year in which the coupon book was sold. We held that the entire amount received from the sale of the coupon books was income for the taxable year in which received.

In *Your Health Club, Inc.*, 4 T. C. 385, a taxpayer on the accrual basis received certain cash and accrued amounts within the taxable year under contracts obligating it to perform services extending beyond the taxable year. We there held that the entire amount constituted income in the year when received or accrued despite the fact that a part of the income was earned during the following year.

In view of the decisions in the foregoing cases, we hold that the entire amount of membership dues received by petitioner during the years here involved constituted income for the year in which received.

Since the entire amount of membership dues was income for the year in which received and since the petitioner's method of accounting for income did not take cognizance of the full amount thereof for such year, it is apparent that the petitioner's method of accounting did not clearly reflect its income. Accordingly, the respondent did not err in determining that petitioner's method of accounting did not clearly reflect income, and in further determining that the entire amount of membership dues received during the taxable years in question constituted income for the years in which received.

### *Issue 4. Depreciation.*

#### FINDINGS OF FACT.

Prior to December 31, 1936, petitioner capitalized on its books additions to furniture and fixtures accounts and the leasehold improvements and building alterations account and periodically made provision for depreciation and amortization with respect thereto. At December 31, 1936, the petitioner charged to its surplus account

the undepreciated balances of those accounts by journal entries summarized as follows:

Cost of assets at December 31, 1936:
| | | |
|---|---|---|
| Office furniture and fixtures—Detroit | $32, 894. 67 | |
| Office furniture and fixtures—Branches | 20, 925. 23 | |
| Leasehold improvements and building alterations | 177, 025. 73 | |
| | | $230, 845. 63 |

Less accumulated reserves for depreciation and amortization to December 31, 1936:
| | | |
|---|---|---|
| Office furniture and fixtures—Detroit | $17, 918. 08 | |
| Office furniture and fixtures—Branches | 12, 264. 58 | |
| Leasehold improvements and building alterations | 177, 025. 73 | |
| | | 207, 208. 39 |

Undepreciated balance charged to surplus _____  $23, 637. 24

Subsequent to December 31, 1936, the petitioner charged to expense the cost of furniture and fixtures and building alterations. There were no leasehold improvements subsequent to that date.

Both prior to December 31, 1936, and subsequent thereto petitioner capitalized on its books additions to its automobiles and trucks account and periodically made provision for depreciation with respect thereto on the basis of a 4-year life.

At January 1, 1943, petitioner had depreciable and amortizable assets, the investment in which (except for automobiles and trucks) was not reflected in its accounts as of that date, such investment having been charged off or expensed previously. The time of acquisition, the cost, the amount of depreciation or amortization sustained to January 1, 1943, the cost less sustained depreciation or amortization to January 1, 1943, and the remaining lives from January 1, 1943, of these assets are as set forth in the following schedules:

### OFFICE FURNITURE AND FIXTURES

| Year | Cost | Depreciation sustained to Jan. 1, 1943 | Cost, less depreciation sustained to Jan. 1, 1943 | Remaining life at Jan. 1, 1943, in years |
|---|---|---|---|---|
| 1928 | $9, 133. 15 | $8, 829. 02 | $304. 13 | ½ |
| 1929 | 6, 179. 28 | 5, 561. 35 | 617. 93 | 1½ |
| 1930 | 13, 159. 95 | 10, 966. 19 | 2, 193. 76 | 2½ |
| 1931 | 9, 393. 81 | 7, 201. 95 | 2, 191. 86 | 3½ |
| 1932 | 2, 192. 79 | 1, 534. 95 | 657. 84 | 4½ |
| 1933 | 1, 214. 11 | 768. 93 | 445. 18 | 5½ |
| 1934 | 3, 611. 72 | 2, 046. 65 | 1, 565. 07 | 6½ |
| 1935 | 5, 531. 45 | 2, 765. 72 | 2, 765. 73 | 7½ |
| 1936 | 7, 295. 15 | 3, 260. 99 | 4, 034. 16 | 8½ |
| 1937 | 19, 724. 59 | 7, 232. 42 | 12, 492. 17 | 9½ |
| 1938 | 18, 672. 45 | 4, 356. 28 | 14, 316. 17 | 10½ |
| 1939 | 17, 420. 39 | 5, 226. 12 | 12, 194. 27 | 11½ |
| 1940 | 17, 772. 62 | 2, 962. 16 | 14, 810. 46 | 12½ |
| 1941 | 25, 035. 77 | 2, 503. 58 | 22, 532. 19 | 13½ |
| 1942 | 13, 897. 64 | 463. 25 | 13, 434. 39 | 14½ |
| Total Jan. 1, 1943 | $170, 234. 87 | $65, 679. 56 | $104, 555. 31 | _____ |

## AUTOMOBILES AND TRUCKS

| Description | Date acquired | Cost | Depreciation sustained to Jan. 1, 1943 | Cost, less depreciation sustained to Jan. 1, 1943 | Remaining life at Jan. 1, 1943 in months |
|---|---|---|---|---|---|
| Ford Sedan | 4/40 | $675.00 | $464.06 | $210.94 | 15 |
| Special Trailer | 6/40 | 720.00 | 465.00 | 255.00 | 17 |
| Plymouth Coupe | 7/40 | 798.25 | 498.91 | 299.34 | 18 |
| Chrysler Brougham | 12/40 | 926.91 | 482.76 | 444.15 | 23 |
| Ford '41 E. R. S. Truck Chassis | 11/40 | 790.00 | 427.92 | 362.08 | 22 |
| Plymouth Panel Del. Truck | 3/41 | 677.71 | 310.61 | 367.10 | 26 |
| Special Body | 1/41 | 275.00 | 137.50 | 137.50 | 24 |
| Plymouth 2 Dr. Sedan | 3/41 | 766.32 | 351.23 | 415.09 | 26 |
| Plymouth Panel Delivery | 3/41 | 784.86 | 359.72 | 425.14 | 26 |
| Chrysler C-30 Six Pass. Sedan | 3/41 | 1,540.40 | 706.01 | 834.39 | 26 |
| Mercury Coupe | 5/41 | 988.80 | 411.99 | 576.81 | 28 |
| Chrsyler C-28 DeLuxe Brougham | 6/41 | 958.98 | 379.59 | 579.39 | 29 |
| Pontiac DeLuxe 6 4-Dr | 6/41 | 811.35 | 321.16 | 490.19 | 29 |
| Ford DeLuxe Coupe | 7/41 | 812.49 | 304.68 | 507.81 | 30 |
| Pontiac—(used) | 6/42 | 800.00 | 116.67 | 683.33 | 41 |
| Plymouth DeLuxe Coupe (used) | 9/42 | 750.00 | 62.50 | 687.50 | 44 |
| Total | | $13,076.07 | $5,800.31 | $7,275.76 | |

## LEASEHOLD IMPROVEMENTS

| Year made | Cost | Depreciation sustained to Jan. 1, 1943 | Cost, less depreciation sustained to Jan. 1, 1943 | Remaining life at Jan. 1, 1943 | |
|---|---|---|---|---|---|
| | | | | Years | Months |
| 1926 | $96,677.35 | $47,855.29 | $48,822.06 | 16 | 10 |
| 1927 | 54,379.07 | 25,286.27 | 29,092.80 | 17 | 10 |
| 1931 | 1,036.00 | 357.42 | 678.58 | 21 | 10 |
| Total | $152,092.42 | $73,498.98 | $78,593.44 | | |

## BUILDING ALTERATIONS

| Year made | Cost | Depreciation sustained to Jan. 1, 1943 | Cost, less depreciation sustained to Jan. 1, 1943 | Remaining life at Jan. 1, 1943 | |
|---|---|---|---|---|---|
| | | | | Years | Months |
| 1927 | $491.00 | $228.31 | $262.69 | 17 | 10 |
| 1931 | 1,233.00 | 425.38 | 807.62 | 21 | 10 |
| 1936 | 190.00 | 37.05 | 152.95 | 26 | 10 |
| 1937 | 16,022.73 | 2,643.75 | 13,378.98 | 27 | 10 |
| 1938 | 5,877.67 | 793.49 | 5,084.18 | 28 | 10 |
| Total | $23,814.40 | $4,127.98 | $19,686.42 | | |

## SPECIAL ASSESSMENT FOR WIDENING BAGLEY AVENUE

| Date | Cost | Amortization sustained to Jan. 1, 1943 | Cost, less amortization sustained to Jan. 1, 1943 | Remaining life at Jan. 1, 1943 |
|---|---|---|---|---|
| Sept. 1934 | $5,236.77 | $538.75 | $4,698.02 | 72 yrs., 8 mos. |

During the years 1943 to 1947, inclusive, there were no additions to the foregoing property accounts nor any retirements therefrom except as set forth in the following table:

| Years | Furniture and fixtures additions | Automobiles and trucks | |
|---|---|---|---|
| | | Additions | Retirements |
| 1943 | $17,407.46 | $6,535.98 | $988.80 |
| 1944 | 7,688.23 | 0 | 0 |
| 1945 | 11,636.43 | 1,906.25 | 0 |
| 1946 | 25,233.84 | 2,549.16 | 2,953.51 |
| 1947 | 36,765.03 | 29,769.17 | 7,230.61 |

OPINION.

The principal controversy under this issue is as to the basis upon which depreciation or amortization allowances are to be computed with respect to the properties set out in our findings and which were used by petitioner in its business during some or all of the years 1943 through 1947. In determining the deficiencies the respondent allowed depreciation or amortization deductions computed on the basis of cost as adjusted for depreciation or amortization during the period of petitioner's ownership prior to January 1, 1943. The petitioner takes the position that it had a tax-exempt status for all years prior to 1943, that the respondent's method of determining the allowances was erroneous, and that for the years 1943 through 1947 it was entitled to depreciation or amortization deductions computed on the basis of cost without adjustment for depreciation or amortization occurring prior to January 1, 1943. Pertinent provisions of the Code are set out below.[5]

[5] SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

(a) BASIS FOR DEPRECIATION.—The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property.

SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS.

(a) BASIS (UNADJUSTED) OF PROPERTY.—The basis of property shall be the cost of such property; * * *

(b) ADJUSTED BASIS.—The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a), adjusted as hereinafter provided.

(1) GENERAL RULE.—Proper adjustment in respect of the property shall in all cases be made—

* * * * * * *

(B) in respect of any period since February 28, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent allowed (but not less than the amount allowable) under this chapter or prior income tax laws. Where for any taxable year prior to the taxable year 1932 the depletion allowance was based on discovery value or a percentage of income, then the adjustment for depletion for such year shall be based on the depletion which would have been allowable for such year if computed without reference to discovery value or a percentage of income ;

(C) in respect of any period prior to March 1, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, to the extent sustained ;

From the record before us we are unable to conclude, as petitioner contends, that it had an exempt status for all years prior to 1943. While it is true that by his rulings in 1934 and 1938 the respondent held that the petitioner was entitled to exemption under the Revenue Act of 1936 and prior revenue acts, in 1945 he ruled that the petitioner was not entitled to exemption under the Code or prior revenue acts and revoked the 1934 and 1938 rulings. Since the 1945 ruling canceled the earlier ones, any presumption as to the correctness of the earlier rulings was thereby removed. So far as shown the petitioner was not at any time during its existence within that class of organizations exempted by the sections of the revenue acts under which the respondent in 1934 and 1938 ruled that it was exempt or within that class of organizations exempted by the corresponding sections of later revenue acts and the Code. Therefore, we are without any basis, factual or otherwise, upon which to find that the petitioner ever had an exempt status at any time. Therefore, it is apparent that the petitioner has rested its position on a ground not shown to have ever existed. So far as appears, the petitioner has always been subject to tax and it is not apparent why for purposes of computing the depreciation allowances for the years 1943 through 1947 the assets in question had any different basis from that provided in the Code. Furthermore, the basis proposed by petitioner would burden income for 1943 and later years by requiring the allowances in those years for all depreciation that actually had occurred prior to January 1, 1943. The petitioner cites no case to support such action and we have not found any.

In 1932, in G. C. M. 10857, XI-2 C. B. 105, it was held under the provisions of sections 111 (a) and (b) and 113 (b) of the Revenue Act of 1928 that where an organization, which was shown to have been exempt under the Revenue Act of 1928 and all prior revenue acts, derived taxable gain in 1931 from the sale of its property, the basis should not be reduced by the amount of depreciation sustained with respect to the property for the period during which the organization occupied an exempt status. In 1952, in G. C. M. 27491, 1952-2 C. B. 221, G. C. M. 10857 was reconsidered and revoked, and it was held that in the case of an organization which was exempt from tax for a prior period and subsequently became subject to tax, in computing the amount of gain or loss from the sale or exchange of property held during all or part of the period that it was exempt, the basis should be reduced by the amount of depreciation sustained with respect to the property for the period held while the taxpayer was exempt. In I. T. 4106, 1952-2 C. B. 130, it was held that under the authority contained in section 3791 (b) of the Internal Revenue Code, the provisions of

G. C. M. 27491 revoking G. C. M. 10857 would be applicable only to sales occurring in taxable years beginning after December 31, 1950.

The petitioner urges that the holding in G. C. M. 10857 sustains its position that its depreciation or amortization deductions for the years 1943 through 1947 are to be computed on the basis of cost without adjustment for depreciation or amortization occurring prior to January 1, 1943, and that the holding in I. T. 4106 gives the petitioner the benefit of G. C. M. 10857 for all the foregoing years. G. C. M. 10857 involved an organization which was shown to have been exempt during the years in which the depreciation there in question occurred. No such showing has been made with respect to petitioner. Because of this factual difference, G. C. M. 10857 would not aid the petitioner even though it be conceded that it correctly interpreted the law. Having reached this conclusion, it becomes unnecessary to consider petitioner's contention as to the benefit conferred by the holding in I. T. 4106.

The petitioner contends that if it is not entitled to the use of a basis of cost without adjustment for depreciation or amortization prior to January 1, 1943, then it is entitled to use as its basis the fair market value of the properties on January 1, 1943. The basis here contended for does not come within the provisions of the Code, *supra*, defining basis. Consequently, the contention of the petitioner must be denied.

In view of what has been said above, it is our opinion that the petitioner's basis for computing depreciation on the properties here involved for the years in question is the same as if the petitioner always had been held to be a corporation subject to tax.

An issue as to the rate of depreciation allowable for the years in controversy with respect to two branch office buildings acquired by petitioner in 1942 has been settled by a stipulation that a rate of 2 per cent is allowable.

An issue as to the amount of the deduction allowable for the years in question as amortization of the petitioner's investment in a leasehold interest acquired by petitioner in 1926 has been disposed of by a stipulation that an amount of $3,089.89 is allowable.

Reviewed by the Court.

*Decision will be entered under Rule 50.*