ESTATE OF ALBERT E. MacCROWE, DECEASED, JAMES C. L. ANDERSON, ADMINISTRATOR, *de bonis non*, WITH THE WILL ANNEXED, AND HAZEL B. MacCROWE (NOW HAZEL B. KEEN), SURVIVING WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 50146. Filed June 20, 1958.

*D. Sylvan Friedman, Esq.*, for the petitioners.
*William H. Schwerdtfeger, Esq.*, for the respondent.

The Commissioner determined deficiencies in income tax and additions for negligence under section 293 (a) of the Internal Revenue Code of 1939, with respect to these petitioners, as follows:

| Year | Deficiency | Addition to tax under section 293(a) |
|---|---|---|
| 1948 | $95,503.26 | $4,902.74 |
| 1949 | 36,163.86 | 1,808.19 |

Two issues in the case were originally litigated and decided by the Tax Court but one, involving the deductibility of $7,000 paid in 1949 to an attorney, decided adversely to the petitioners by the Tax Court, was affirmed by the United States Court of Appeals for the Fourth Circuit. The only other issue properly presented for decision (which is the only issue now remaining for decision) is: What is the amount of gross receipts which Albert E. MacCrowe, hereafter referred to as MacCrowe, received during the years 1948 and 1949 from the performance of illegal operations? The Court of Appeals, in remanding

the case on that remaining issue, stated in its opinion that it was remanded—

to the Tax Court to find the facts, with full power to go into the case de novo and make findings, either on the evidence already taken or on further evidence, without feeling bound in any way by the determination heretofore made.

The parties thereafter advised the Tax Court that they do not desire to submit any further evidence.

FINDINGS OF FACT.

Albert E. and Hazel B. MacCrowe filed joint income tax returns for 1948 and 1949 with the collector of internal revenue for the district of Maryland. The 1949 return was filed on August 25, 1950, and on October 29, 1950, MacCrowe died at the age of 76. Hazel subsequently remarried and is now Hazel B. Keen.

Albert's occupation as stated on his 1949 return was "Physician." His address was given on his returns as Kingsville, Baltimore County, Maryland, but he maintained an office and other establishments in Baltimore where, during the taxable years, he was engaged exclusively in the performance of illegal operations on pregnant women. Most of the operations were curettages, but a few were abortion and miscarriage operations.

Code indications of fees fixed on schedules of appointments were erased promptly after the money was received and MacCrowe destroyed the schedules after the operations were performed so that no such incriminating record would exist. He tried in all ways to avoid incriminating evidence of his illegal business. He kept no books or records from which his gross receipts from those operations could be determined.

Each return indicates that it was prepared by an agent from information submitted by the taxpayer. The agent who prepared the 1949 return was not the one who had prepared the 1948 return. $50,000 was shown as the "Estimated" total receipts from MacCrowe's business as "Physician" for 1948. This item was further explained in a footnote as follows: "Taxpayers net income from profession estimated based on data submitted by himself in absence of complete records." The $50,000 was reduced to a net income on the return by cost of goods sold and other business deductions. Total "Estimated" receipts of $24,000 were reported on the return for 1949 from the business of "Physician." This item was explained in a footnote on the return in the same way that the total receipts for 1948 were explained. Business deductions were shown on the return which reduced gross receipts to a net income. Income from other sources was shown on both returns.

MacCrowe used two houses during 1948 and three houses during 1949 in performing the illegal operations and for the patients' re-

covery. One was the house of Laura Hitchens at 3906 Woodhaven Avenue containing 8 beds, 7 of which were used regularly, 1 in emergencies. Another was the house of Mary Taylor, 5601 Parkside Avenue, Park Heights, containing 13 beds, 12 of which were used regularly, 1 in emergencies. A third house used, beginning in January 1949, was that of R. W. Coffman on Lake Avenue, containing 8 beds, 7 of which were used regularly, 1 in emergencies. Coffman was a son of Laura Hitchens.

Laura Hitchens was first employed by MacCrowe in 1940; shortly thereafter she began to take a few of his patients in her house, and, as MacCrowe's confidence in her increased and at his request, she rearranged her house and added beds until, during 1948 and 1949, 7 beds in her house were regularly used and in emergencies her own bed in addition was used for patients. All of the beds were not occupied at all times. Two maids were employed to assist in her house.

Laura assisted MacCrowe during the taxable years as secretary and receptionist and by interviewing patients, fixing and collecting the fees, scheduling the operations, preparing instruments and equipment for the operations, attending MacCrowe during the operations, providing beds and care for some of the patients in her home and in other ways.

The interviews were to determine, among other things, the length of the pregnancy, background, whether married or single, prior children, abortions, if any, operations, general health, what their doctor had said, and their ability to pay the required fee. If the interviewer had any doubt about the advisability of accepting the patient or as to whether less than the regular fee should be charged, MacCrowe was consulted. Laura interviewed as many applicants as she could, but "[t]here were always more than I [she] could interview."

Coffman began to work for MacCrowe about 1940, and his duties gradually increased. He drove cars, transported patients from the office to the "nursing homes," ran errands, and, in the absence of his mother over weekends, acted as secretary and receptionist, interviewed patients, fixed and collected fees, and helped in the operating room, in which activities during the taxable years he spent the "better part of each day." His assistance during the operations included bringing boiling water and picking up heavy patients who had fainted. Neither he nor his mother was a nurse, administered any drug, or took any direct part in the actual operations on the patients.

Patients usually reported at night, were operated upon before morning and left within 12 to 48 hours after the operation, depending upon how they recovered. Several operations might be performed in one night. MacCrowe usually took a few short vacations each year.

He worked weekdays and sometimes on Sunday for at least 40 weeks during 1948 and for about 20 weeks in 1949 mostly during the first 6 months, after which he supervised the business but, due to ill health, had another "doctor," unnamed in the record, perform illegal operations for him up to the time of the raid.

MacCrowe paid Laura $40 a week regularly and gave her additional amounts as he saw fit. His total payments to her amounted to between $6,000 and $9,000 in each of the years 1948 and 1949. She did not work over weekends. MacCrowe paid Coffman $11,963.58 in 1948 and $9,663.50 in 1949.

MacCrowe was hoping during the taxable years to make enough money on which to retire in the near future and undertook a heavy schedule of operations. Patients came to him from many places in the United States and elsewhere. He had reluctantly turned away some desirable patients for lack of beds and he persuaded Coffman to obtain a larger house so that patients could be taken into his house. Coffman obtained a house containing 7 regular and 1 emergency beds which were used for MacCrowe's patients beginning in January 1949.

Laura and Coffman worked for MacCrowe until the business of performing the illegal operations was discontinued at the time of a simultaneous raid on all of the above-described premises by the Baltimore police in October 1949. MacCrowe was indicted on three counts: Alleged conspiracy to commit abortion, attempt to commit abortion, and abortion. He entered a plea of guilty to the three counts and was sentenced to 5 years in prison, which sentence was suspended on payment of a fine of $5,000 and costs.

The regular fee charged by MacCrowe during the taxable years for an illegal operation was $400. About 90 per cent of the patients paid that amount. Most of the remaining patients paid $500 or more, one patient having paid $1,000. MacCrowe, for a personal friend or for a former patient, might reduce the fee to $350, and during the taxable years treated 12 patients or fewer free. The fees he received during the taxable years averaged $400 per operation and all were paid in cash.

Each patient, within the hour preceding the operation, was given an injection as an anesthetic or to allay pain. The injection invariably consisted of one tablet, known as HMC No. 1, dissolved in a hypodermic needle and injected in the patient by MacCrowe. Only one such tablet could be used safely. He was very careful of these tablets which could not be obtained except by a physician. He never used more than one tablet per patient. MacCrowe purchased 12 tubes containing 20 tablets each of this drug from a wholesaler in pharmaceuticals in Baltimore on each of the following dates: May 11, 1948, October 13, 1948, and February 24, 1949.

The Commissioner, in determining the deficiency for 1948, increased the net income shown on the return by "Unreported income—$142,000.00." His explanation for that adjustment was:

Gross receipts from profession of Dr. Albert E. MacCrowe for the year 1948 are increased in the amount of $142,000.00, as computed below:

Gross receipts from profession:

| | |
|---|---:|
| Corrected (480 patients at $400.00 per patient)_____ | $192, 000. 00 |
| Estimated receipts reported on return_____ | 50, 000. 00 |
| Unreported income_____ | 142, 000. 00 |

The Commissioner, in determining the deficiency for 1949, increased the net income shown on the return by "Unreported income—$72,000.00." He gave the following explanation for that deduction:

Gross receipts from the profession of Dr. Albert E. MacCrowe for the year 1949 are increased in the amount of $72,000.00, computed as follows:

Gross receipts from profession:

| | |
|---|---:|
| Corrected (240 patients at $400.00 per patient)_____ | $96, 000. 00 |
| Estimated receipts reported on return_____ | 24, 000. 00 |
| Unreported income_____ | 72, 000. 00 |

MacCrowe performed illegal operations in 1948 on at least 480 women and received as payment for those services at least $192,000 all of which was received by him in cash during 1948.

MacCrowe performed illegal operations in 1949 on at least 240 women and received as payment for those services at least $96,000 all of which was received by him in cash during 1949.

OPINION.

Murdock, *Judge:* The determination of a deficiency by the Commissioner is presumed to be correct and the taxpayer has the burden of proof to show that the Commissioner erred in some respect and overstated the income. Only one of the adjustments made by the Commissioner in each year in determining the deficiencies is now in issue, i. e., the only items now in controversy are the gross receipts each year of MacCrowe from the illegal operations which he performed. The petitioners in this case have failed to show that the Commissioner erred in making those adjustments or that his determinations were in any way arbitrary or capricious. There is no controversy about farm income, income or loss from racehorses, or any other income or deductions reported on the joint returns for the taxable years. The evidence introduced by the petitioners did not refer directly to the question of what MacCrowe's gross receipts from illegal operations might have been for either taxable year and did not deal directly with any adjustment made by the Commissioner in determining the deficiencies. Their evidence showed the values at which personal property belonging to MacCrowe was appraised in

administering his estate. The apparent purpose was to draw an inference from that evidence that MacCrowe could not have made as much money in 1948 or in 1949 as the Commissioner had determined. The petitioners' evidence was inadequate for any such purpose. Their evidence also showed that the agents who prepared the returns, although they had information with regard to farm income, racehorse income, and deductions in connection with those two activities and in connection with the illegal operations business, nevertheless had no adequate information of how much MacCrowe's gross receipts from his illegal operations were in either taxable year, the only issue for decision. The evidence offered by the petitioners, considered as a whole, did not sustain their burden of proof or in any way show that the determination of the Commissioner was arbitrary or capricious.

Counsel for the Commissioner moved for judgment on the record made when counsel for the petitioners stated, "That is the petitioners' case." The trial Judge overruled the motion and the Commissioner then presented evidence which showed affirmatively that the amount of gross receipts which he had included in computing MacCrowe's income for 1948 and 1949 in determining the deficiencies was not in excess of what MacCrowe had actually received during those years from his business of performing illegal operations. The Commissioner's determination is based upon the performance of 480 operations in 1948 and 240 in 1949 at $400 each.

The evidence produced by the Commissioner comes principally from two persons who apparently were MacCrowe's most important employees during 1948 and 1949 in his business of performing illegal operations. Their testimony was forthright and not contradicted or impeached. They evinced no animosity towards him and, although they knew of his desire to avoid all dangerous disclosures on income tax forms or otherwise, they had a high regard for his ability and personality.

The record shows beyond a doubt that the regular fee charged and paid in cash by patients of MacCrowe during the taxable year was $400, and that an average of at least $400 was received from all of the persons on whom he performed illegal operations during those years. On rare occasions he charged no fee. He reduced the fee to $350 for a very few patients but in more instances he charged and received $500 or more, even as high as $1,000, for an operation. The record as a whole fully justifies the finding, which has been made, that the total amount received, divided by the total operations, would have amounted to $400 at least for each year.

The evidence shows also that MacCrowe was performing a heavy schedule of illegal operations in 1948 and that he undertook an even heavier schedule in 1949. He did not accept patients for any other purpose during those years. He worked on weekdays and

sometimes on Sundays and could and did perform as many as 30 or more operations in one week during each of the taxable years. He was using two houses in 1948 having a total regular bed capacity of 19 beds, plus 2 additional beds which were used if the others were all occupied. Patients usually came in at nightfall and the operation was performed before morning. They might be discharged in 12 hours after the operation if they got along well, but if they did not recover in that time they would be discharged within 24 hours after the operation, except in some instances when they might remain for 48 hours after the operation. The average time that a patient occupied a bed must have been less than 2½ days, and, allowing one-half day to prepare the room for a new patient, would make 3 days. MacCrowe worked at least 40 weeks in 1948. There are 280 days in 40 weeks. During that time one bed could provide accommodation for over 90 patients and 6 beds could provide accommodation for over 480 patients. Over 19 beds were available for MacCrowe's use during all of 1948; he wanted more beds for patients and obtained more at the start of 1949. Clearly, there was available to him sufficient bed capacity to perform far more than 480 operations during 1948 and to perform more than 240 operations during the part of 1949 that he was working at his illegal business.

The evidence shows that MacCrowe did not lack sufficient patients in order to perform at least the number of operations which the Commissioner has used in determining the deficiencies. Indeed, the record indicates that some desirable patients were turned away for lack of beds. The evidence also shows clearly that MacCrowe used one, and only one, so-called HMC No. 1 tablet on each patient, and it has been stipulated that he purchased 480 of such tablets during 1948 and 240 during 1949. The evidence in no way negatives the possibility that he might have purchased and used more in each year. The testimony would justify a finding that far more than 480 operations in 1948 and 240 operations in 1949 were performed, but no such finding is necessary since the Commissioner is not asking for an increased deficiency for either year over the amount determined by him for that year.

Counsel for the petitioners, after both sides had put in their evidence in chief, called revenue agent Casler, apparently as a rebuttal witness, and attempted to show by him that the gross receipts figures of $192,000 for 1948 and $96,000 for 1949, used by the Commissioner in determining the deficiencies, were arbitrary and unreliable because the Commissioner had determined the number of operations solely from the number of HMC No. 1 tablets purchased. The evidence fails to show, however, that this witness knew how the Commissioner computed the gross receipts except as shown in the deficiency notice. The Commissioner, in the notice of deficiency, stated that the deficien-

cies were determined "upon the basis of information on file in the Bureau of Internal Revenue and after consideration has been given to the report of examination dated May 5, 1952; to your protest dated June 17, 1952; and to the statements made at the conference held on July 17, 1952." Counsel for the petitioners, in connection with the testimony of Casler, put in evidence as Exhibit 8 a letter to Hazel B. Keen to which was attached the report of revenue agent Casler dated May 5, 1952. That report did not propose any increase in the gross receipts of MacCrowe over the amount reported in the joint returns for 1948 and 1949 and did not even refer to the income of MacCrowe from his business as "Physician." The record does not show that the Commissioner, in making the adjustments now in controversy, relied in any way upon this revenue agent, and his testimony is not competent to show and does not show how or why the Commissioner made the adjustments to MacCrowe's gross receipts.

The Court, after carefully examining all parts of the record in this case, is satisfied that MacCrowe's gross receipts from the illegal operations which he performed in 1948 and 1949 were not less than the amounts determined by the Commissioner. All issues presented for decision are now decided against the petitioners.

*Decision will be entered for the respondent.*