AUTOMOBILE CLUB OF NEW YORK, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 61999. Filed July 20, 1959.

*Michael Kaminsky, Esq.*, for the petitioner.
*Norman L. Rapkin, Esq.*, for the respondent.

## OPINION.

RAUM, *Judge:* The parties have filed a stipulation of facts which is hereby adopted as our findings. Petitioner, a New York corporation having its principal office in New York City, filed its income and excess profits tax returns here involved with the then collector of internal revenue for the third district of New York. It was incorporated on April 26, 1934, under the Membership Corporation Law of the State of New York; it functions as an "automobile club" which provides emergency road service, travel assistance, personal accident policies, bail bonds, and other similar and related services to its members. For purposes of this litigation, it is conceded that petitioner is not a tax-exempt organization and is subject to tax in the same manner as any other corporation carrying on or engaged in business for profit.

Petitioner maintains its books and records on a calendar year basis and has from its inception employed "the accrual method" in keeping

its corporate accounts. In 1943, the first year petitioner was required to file a corporation income tax return, and for the years 1944 and 1945, petitioner reported receipts from membership dues as gross income in the year of receipt. However, petitioner subsequently filed amended 1944 and 1945 returns in which it deferred a ratable portion of its receipts from membership dues in accordance with the method of bookkeeping employed in keeping its corporate accounts; returns for 1946 through 1950 reported income according to the same method.

Membership dues constituted the primary source of petitioner's annual revenues, as indicated below:

| Year | Membership dues | Initiation fees | Miscellaneous receipts |
|---|---|---|---|
| 1944 | $383,700 | (1) | $3,705.01 |
| 1945 | 680,595 | (1) | 7,725.89 |
| 1946 | 1,477,560 | $24,175 | 24,175.00 |
| 1947 | 1,996,965 | 231,875 | 154,002.10 |
| 1948 | 2,687,490 | 289,985 | 134,594.32 |
| 1949 | 3,171,270 | 254,975 | 182,653.95 |
| 1950 | 3,761,745 | 279,880 | 226,371.11 |

1 None.

The column headed "Miscellaneous receipts" represents receipts from the operation of a driving school, proceeds of the sale of maps and publications, travel bureau commissions, and other items.

A person otherwise qualified for membership became a member upon payment of an initiation fee and annual dues of $15; payment might be made on any day of the calendar year. For years subsequent to the first year of membership, annual dues became payable on the last day of the month corresponding to the month in which the member was originally admitted to membership. Initiation fees were reported in full by petitioner as gross income in the year of receipt. Annual dues, on the other hand, were not immediately recorded as receipts of income on petitioner's books, nor were they reported in full as gross income in the year of receipt. Petitioner instead credited each month's receipts to a reserve account; during the first month of membership and each of the following 11 months, one-twelfth of the reserve was taken into income. The effect of this accounting was to spread the receipts of any given month ratably over the ensuing 12-month period. Consequently, at the end of each calendar year, the reserve account contained substantial funds which petitioner had received during the year but had not yet credited to income; such funds remained to be taken into income ratably over that part of the 12-month period falling in the next calendar year. The amounts of annual receipts thus deferred are shown by the following table:

| Year | Dues received | Dues reported as income | Dues deferred and not reported as income |
|------|--------------:|------------------------:|-----------------------------------------:|
| 1944 | $383, 700 | [1] $351, 570. 60 | [1] $32, 129. 40 |
| 1945 | 680, 595 | [1] 479, 572. 74 | [1] 201, 022. 26 |
| 1946 | 1, 477, 560 | 1, 005, 813. 12 | 471, 746. 88 |
| 1947 | 1, 996, 965 | 1, 722, 312. 49 | 274, 652. 51 |
| 1948 | 2, 687, 490 | 2, 348, 615. 00 | 338, 875. 00 |
| 1949 | 3, 171, 270 | 2, 911, 775. 00 | 259, 495. 00 |
| 1950 | 3, 761, 745 | 3, 464, 268. 75 | 297, 476. 25 |

[1] Per amended return.

The annual increase in receipts from membership dues was attributable to the steady increase in petitioner's membership from 25,580 in 1944 to 250,783 in 1950.

All receipts of membership dues were deposited in petitioner's bank account, unsegregated from its general funds, and were available and used without restriction for general corporate purposes. Petitioner's bylaws provided that if a member resigned (or canceled his contract with petitioner), he forfeited all rights in petitioner's property and assets and was not entitled to a refund of any portion of his advance payments. In the event of liquidation, dissolution, or other discontinuance of petitioner's business, any surplus remaining after payment of debts and liabilities would be distributed to charities selected by petitioner's board of directors, and not to petitioner's members.

Petitioner incurred certain expenses in rendering services to its members. The table below reveals the annual amounts of such expenses and the purposes for which they were incurred:

| Year | Emergency road service | Travel department | Personal accident policies and bail bonds |
|------|-----------------------:|------------------:|------------------------------------------:|
| 1944 | $83, 389. 23 | $33, 566. 28 | $25, 925. 34 |
| 1945 | 161, 606. 74 | 55, 837. 29 | 46, 021. 09 |
| 1946 | 313, 325. 12 | 172, 794. 66 | 99, 364. 50 |
| 1947 | 546, 507. 37 | 332, 389. 16 | 134, 793. 40 |
| 1948 | 899, 512. 91 | 395, 756. 60 | 181, 864. 72 |
| 1949 | 860, 895. 87 | 454, 834. 62 | 214, 887. 43 |
| 1950 | 1, 185, 644. 63 | 521, 188. 21 | 254, 553. 93 |

Petitioner could not estimate in advance the amount of monthly or annual expenses that would be incurred in rendering services to its members since such expenses were dependent upon the membership's demands and requirements. For example, the largest component of expenses incurred for "Emergency road service" was for "towing." Pursuant to separate contracts between petitioner and various automobile service stations, the stations agreed to tow a member's automobile from the point of disablement to the station's place of business or any other station on the way to the contracting station's place of business; petitioner agreed to pay for such emergency towing service

(and other incidental mechanical service) at a flat rate per call, either $1.50, $2, or $2.50, depending on the terms of the particular contract. No limit was imposed on the number of calls a member could make. In addition, petitioner's board of directors reserved the discretion to grant monthly and/or quarterly bonuses to contracting stations which rendered satisfactory service to petitioner's members during the particular month or quarter. The cost of providing travel assistance likewise depended on the demands of the membership. The average *annual* cost per member of providing emergency road service and travel assistance varied between a low of $4.57 in 1944 and a high of $7.23 in 1948; the variation in the average *monthly* cost per member for the same services in any given year ranged from 24 per cent to 100 per cent. The range per year of such average monthly costs per member, with their corresponding percentage variations, are as follows:

| Year | Range per year | Percentage variation per year |
|---|---|---|
| 1946 | $0.49–0.67 | 37 |
| 1947 | .54–.67 | 24 |
| 1948 | .50–1.00 | 100 |
| 1949 | .47–.65 | 38 |
| 1950 | .50–.75 | 50 |

In addition to the above services, petitioner made a purchase discount plan available to its members. Pursuant to contracts, petitioner sold "savings plan coupons" to service stations and automobile accessory stores at face value (100 cents in coupons for $1); the contracting stations and stores then distributed the coupons to petitioner's members in an amount equal to 10 per cent of each member's purchases. Members could then redeem their coupons either by applying them to the payment of annual dues or having them refunded in cash by petitioner; the coupons did not have a time limit for redemption. In most years, petitioner's receipts from the sale of coupons exceeded the amounts paid out in redemptions, as follows:

| Year | Sales | Redemptions | Sales in excess of redemptions | Redemptions in excess of sales |
|---|---|---|---|---|
| Nov. to Dec. 1935 | $1,775.00 | $20.27 | $1,754.73 | |
| 1936 | 18,267.26 | 6,701.31 | 11,565.95 | |
| 1937 | 38,844.67 | 22,924.48 | 15,920.19 | |
| 1938 | 54,850.81 | 44,016.79 | 10,834.02 | |
| 1939 | 80,703.73 | 57,310.12 | 23,393.61 | |
| 1940 | 108,910.23 | 87,960.01 | 20,950.22 | |
| 1941 | 121,593.47 | 94,369.15 | 27,224.32 | |
| 1942 | 43,242.21 | 126,302.60 | | $83,060.39 |
| 1943 | 4,406.06 | 13,444.13 | | 9,038.07 |
| 1944 | 2,738.13 | 4,428.67 | | 1,690.54 |
| 1945 | 6,985.76 | 3,224.95 | 3,760.81 | |
| 1946 | 97,099.32 | 26,499.88 | 70,599.44 | |
| 1947 | 296,738.08 | 145,087.71 | 151,650.37 | |
| 1948 | 544,449.50 | 315,405.78 | 229,043.72 | |
| 1949 | 963,967.79 | 654,159.75 | 309,808.04 | |
| 1950 | 1,193,546.72 | 1,007,450.48 | 186,096.24 | |

Coupons offered for redemption by service stations and accessory stores (as opposed to those redeemed by petitioner's members) were redeemed only upon cancellation of the savings plan contracts between petitioner and the redeeming stations or stores. The amounts of such redemptions never exceeded between $200 and $300 in any given year.

No amounts received from the sale of coupons during the taxable years in question were reported by petitioner as income, nor were any redemptions taken as deductions. Instead petitioner credited all sales proceeds, and debited all redemptions, to a reserve account. The credit balance in the reserve account increased as follows during the taxable years in question:

| Year | Credit balance | Year | Credit balance |
|---|---|---|---|
| 1944 | $57,854.04 | 1948 | $512,908.38 |
| 1945 | 61,614.85 | 1949 | 782,716.42 |
| 1946 | 132,214.29 | 1950 | 968,812.66 |
| 1947 | 283,864.66 | | |

The "Credit balance" shown on the exhibit submitted jointly by the parties has been increased, as agreed to by them, by $40,000 for the years 1944 through 1948 to reflect a debit to the reserve for coupon redemption in 1942, which entry was reversed in 1949.

All receipts from the sale of coupons were deposited in petitioner's general bank account, unsegregated from its general funds, and were available and used without restriction for general corporate purposes. Those redemptions paid in cash were likewise paid from petitioner's general and unsegregated funds.

Petitioner, at all times, maintained sufficient cash and liquid securities to redeem all outstanding coupons; but such assets were not segregated from general corporate assets not restricted to any particular use.

1. *Deferral of membership dues.*—This Court has consistently held that the Commissioner has authority to require that prepaid income be reported no later than the year in which it is received, provided such income is subject to unrestricted use by the taxpayer. This rule applies to taxpayers on an accrual basis as well as to those on the cash basis; it applies even though the income may in a sense be regarded as "earned" in a year subsequent to the year of receipt, and even though some systems of accounting in the business world may recognize deferral in such circumstances. *E. B. Elliott Co.*, 45 B.T.A. 82; *South Dade Farms, Inc.* v. *Commissioner*, 138 F. 2d 818 (C.A. 5), affirming a Memorandum Opinion of this Court; *Clay Sewer Pipe Association, Inc.*, 1 T.C. 529, affirmed 139 F. 2d 130 (C.A. 3); *South Tacoma Motor Co.*, 3 T.C. 411; *Your Health Club, Inc.*, 4 T.C. 385; *National Airlines, Inc.*, 9 T.C. 159; *Capital Warehouse Co.*, 9 T.C. 966, affirmed 171 F. 2d 395 (C.A. 8); *Krim-Ko Corporation*, 16 T.C.

31, 38–40; *Curtis R. Andrews*, 23 T.C. 1026; *Advertisers Exchange, Inc.*, 25 T.C. 1086, affirmed per curiam 240 F. 2d 958 (C.A. 2); *Automobile Club of Michigan*, 20 T.C. 1033, affirmed 230 F. 2d 585 (C.A. 6), affirmed 353 U.S. 180; *Bressner Radio, Inc.*, 28 T.C. 378, on appeal (C.A. 2); *New Capital Hotel, Inc.*, 28 T.C. 706, affirmed per curiam 261 F. 2d 437 (C.A. 6). Our decision in *Beacon Publishing Co.*, 21 T.C. 610, was reversed in 218 F. 2d 697 (C.A. 10), but we have previously noted our agreement with the dissenting opinion in that case. *Curtis R. Andrews, supra* at 1033. Cf. *Schuessler* v. *Commissioner*, 230 F. 2d 722 (C.A. 5), reversing 24 T.C. 247. Moreover, the uncertain basis upon which the decisions of the Courts of Appeals in the *Beacon* and *Schuessler* cases rest is underscored by the statement of the Supreme Court in *Automobile Club* v. *Commissioner*, 353 U.S. 180, 189 fn. 20, to the effect that, "We express no opinion upon the correctness of the decisions in *Beacon* or *Schuessler*."

We are not persuaded that the case at bar warrants modification of the established rule which has been followed in a long line of cases. There is no serious question here that the amounts in controversy are taxable as income. The only issue is *when*. Ordinarily, under the cash system, items of income are taxable when received and deductions are allowable when payment is made. On an accrual basis of accounting, items of income and deduction may "accrue" even prior to actual receipt or payment; income is treated as received when the right thereto becomes fixed and deductions are allowable when the liability in respect thereof is unqualifiedly determined. As a practical matter, the income tax laws must operate on an annual basis, and there is no assurance under either an accrual or cash basis of accounting that there will be complete correlation between items of income and deductions pertinent thereto in any given taxable year or that income will always be taxed in the year "earned." As the foregoing cases strikingly demonstrate, income may be taxed in one year, although the events to which it may pertain may occur in a subsequent year. The question simply is: When was the income received under the cash system, or when did it accrue under an accrual system (i.e., when did the taxpayer acquire the unqualified right thereto)? Thus, in *National Airlines*, 9 T.C. 159, the taxpayer was required to report as income receipts from ticket sales regardless of whether the transportation represented by the tickets had been furnished by the end of the year, and notwithstanding the direction of the Civil Aeronautics Board to defer receipts from tickets where transportation had not yet been furnished. The other cases cited above have reached the same general conclusion in a wide variety of factual situations.

Under accrual accounting, a taxpayer may be required to accrue an item prior to actual receipt if the right thereto has become unquali-

fiedly established. But where there is actual receipt and the funds are at the unrestricted disposal of the taxpayer, as is the case here, all the events have already occurred that call for accrual. It has not been the practice in tax accounting to enter upon a further inquiry as to whether the income has been "earned" in order to defer the reporting of such income to a later year. The practical difficulties in embarking upon such inquiry and the burden of making the necessary allocations of the amounts of income which, though realized in the taxable year, would have to be charged in part to the taxable year and in part to other years, make clear why no such system has ever been part of the general scheme of our tax laws. To be sure, there may be special situations, such as those involving bond premiums, where specific regulations have permitted "amortization" of the premiums over the life of the bonds. But even in those exceptional situations, it has been recognized that the premium income is *realized* in the year the bonds are issued. Cf. *Old Colony R. Co.* v. *Commissioner*, 284 U.S. 552. There are no such special regulations or exceptional statutory provisions [2] applicable in the present case, and there is therefore no reason to depart from the general rule. An item of income cannot accrue for tax purposes *after* it has in fact been received subject to the unrestricted use of the taxpayer. Income may accrue prior to receipt, but not subsequent thereto.

Petitioner earnestly urges upon us a highly elaborate analysis of the Supreme Court's opinion in the *Automobile Club* case in support of its position. But that opinion affirmed the decision of the Court of Appeals which in turn approved our decision in that case, and, notwithstanding certain language relied upon by petitioner, we cannot say that there was an intention on the part of the Supreme Court to disapprove the theory on which this long line of cases has been bottomed. To the contrary, we find monitory language about the *Beacon* and *Schuessler* cases where the decisions of this Court were reversed.

Whether the Commissioner's action herein be regarded merely as correcting certain items within petitioner's system of accounting or whether it be treated as requiring a different system of accounting is not a matter of crucial significance. If the former, he was plainly justified in so doing because the income in question must be taxed no later than when received under either cash or accrual systems of accounting. And if the latter, he is on even stronger ground. For, the latitude allowable to the Commissioner is very broad, and it is not the function of the courts to exercise the discretion which under the statute is committed to him. As the Supreme Court said

---

[2] A change in the law made by section 452 of the Internal Revenue Code of 1954 permitted the deferral of reporting of "prepaid income" in accordance with specified conditions. However, these provisions were not made retroactive, and, in any event, they were retroactively repealed by the Act of June 15, 1955, ch. 143, 69 Stat. 134.

in *Brown* v. *Helvering*, 291 U.S. 193, in sustaining the Commissioner in disallowing both the accrual of reserves for future cancellations of insurance policies and the deferral of gross overriding commissions received on such policies (pp. 203–204) :

Moreover, the method employed by the taxpayer is never conclusive. If in the opinion of the Commissioner it does not clearly reflect the income, "the computation shall be made upon such basis and in such manner" as will, in his opinion, do so. *United States* v. *Anderson*, 269 U.S. 422, 439 * * *; *Lucas* v. *American Code Co.*, 280 U.S. 445, 449 * * *

*   *   *   *   *   *   *

It is not the province of the court to weigh and determine the relative merits of systems of accounting. * * *

See also *Security Flour Mills* v. *Commissioner*, 321 U.S. 281, 286.

The contention that the tax is "in violation of the Sixteenth Amendment" is without substance. Petitioner completely misconceives the purpose and effect of the amendment. See *Penn Mutual Indemnity Co.*, 32 T.C. 653. Moreover, the amounts received do not cease to be "income" under the statute merely because all the expenses allocable to the earning of such income have not yet been incurred. Wholly apart from the question whether pertinent expenses generally affect the quality of receipts as income, the point here is that net income under the statute is computed on an annual basis, and, as pointed out above, there is no necessary correlation in any given year between receipts and expenses. Expenses with respect to income not yet earned are deductible when paid or accrued; and conversely, income is reportable when received or accrued, notwithstanding that some, or even all, expenses allocable thereto have not yet been incurred. Plainly, nothing in the Constitution prohibits any such result.

Subsequent to the preparation of this opinion, the Court of Appeals for the Second Circuit, on May 28, 1959, reversed our decision in *Bressner Radio, Inc.*, 28 T.C. 378. However, the Court of Appeals itself undertook to distinguish *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180, affirming 230 F. 2d 585 (C.A. 6), which, in turn, affirmed our decision, 20 T.C. 1033. Without pausing to comment upon the distinctions, we think that the present case more closely resembles the *Automobile Club of Michigan* case, and we therefore find no reason to reach a different result here.

2. *Proceeds from the sale of savings plan coupons.*—Petitioner advances three arguments to support its contention that the excess of annual proceeds from the sale of coupons over annual redemptions does not represent taxable income: (a) That it did not intend to make a profit on the transaction since it was obligated to pay out to members the same amount which it received in the form of sales proceeds; (b) that it did not "own" the proceeds but held them as trustee for

its members; and (c) that the Commissioner's determination is arbitrary in that, if the Commissioner wishes to avert petitioner's realization of a windfall from the failure of petitioner's members to redeem their coupons, his determination must be limited to such windfall.

We have had a number of occasions in the past to consider similar contentions, in analogous situations, and have repeatedly held that unrestricted income, subject only to a contingent liability to refund in future years, must be reported in the year of receipt, with the consequence that deductions for refunds may be taken in the year in which such refunds are in fact made. See, e.g., *Beadleston & Woerz, Inc.*, 5 B.T.A. 165; *Plymouth Brewing & Malting Co.*, 16 B.T.A. 123; *Okonite Co.*, 4 T.C. 618, affirmed on other issues 155 F. 2d 248 (C.A. 3), certiorari denied 329 U.S. 764; *Fort Pitt Brewing Co.*, 20 T.C. 1, affirmed 210 F. 2d 6 (C.A. 3). The result is required by the system of reporting income on the basis of annual accounting periods.

The fact that petitioner did not intend ultimately to profit from the coupon transactions is not controlling. As was stated by the Court of Appeals in *Fort Pitt Brewing Co.*, supra at 8, "even though no trust is created, such a procedure of deposits and repayments is not designed for gain; yet at times it may yield income. These characteristics are properly reflected in accounting and recognized in taxation." Similarly, in *Plymouth Brewing & Malting Co.*, supra at 128, it was stated:

Usually at the end of any year, containers are outstanding in the hands of the customers and income for the year includes charges for the outstanding containers; in the end, the charges will be nullified by credits for such of the containers as are returned. Although there is intended ultimately no gain in the transaction, the tide of "income" ebbs and flows over the dividing line between the statutory taxable years. We have decided that a reserve is unallowable by way of excluding from income the charge for containers expected to be returned. *Beadleston & Woerz, Inc.*, 5 B.T.A. 165.

Our opinion in the *Fort Pitt* case held that the Commissioner did not act arbitrarily in refusing to accept a method of accounting whereby taxpayer credited all deposits, and debited all refunds, to a reserve account for the containers in which it sold its products; we recognized that under the taxpayer's method the Commissioner might be compelled to wait an unreasonable time, perhaps indefinitely, for the collection of tax on amounts which in fact would never be refunded. The facts in the case at bar suggest a similar conclusion, witness the increase in the credit balance of the reserve account from $57,854.04 in 1944 to $968,812.66 in 1950, an increase of nearly 17 times during a 6-year period, while membership increased only about 10 times during the same period. Unless petitioner is able to account for coupon transactions in a manner likely to avert the obvious windfall inherent in its present method, it fails to carry the burden of proving the Commissioner's determination to be arbitrary.

Finally, petitioner's argument that it did not "own" the proceeds but held them subject to a "trust" for its members has no support in the record, particularly in view of petitioner's stipulation that the funds might be used for general corporate purposes. *Clay Sewer Pipe Ass'n* v. *Commissioner*, 139 F. 2d 130 (C.A. 3), affirming 1 T.C. 529; *Krim-Ko Corporation*, 16 T.C. 31. *Seven-Up Co.*, 14 T.C. 965, upon which petitioner relies, was distinguished in *Krim-Ko Corporation*, *supra* at 40, as involving "a mere conduit in passing funds." Cf. *Broadcast Measurement Bureau, Inc.*, 16 T.C. 988.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

OPPER, *J.*, concurring: It would be idle to suggest that the rules to be followed by taxpayers in attempting to account for net income to the satisfaction of the Tax Court are either clear or consistent. In *Pacific Grape Products Co.*, 17 T.C. 1097, revd. (C.A. 9) 219 F. 2d 862, that petitioner's customers had contracted to buy and petitioner had billed them for its products as of the end of the current year. The amounts so established as due to petitioner from its customers were accrued as income by it in accordance with its long-established accounting practice. Cf. *Heer-Andres Investment Co.*, 17 T.C. 786. But we held that this was incorrect, on the theory, in effect, that the goods not yet having been shipped, the *quid pro quo* for which the obligation was undertaken had not yet been performed. Here, on the other hand, a long-established accounting practice, which accomplishes in practical effect what we required in *Pacific Grape Products Co.*, *supra*, is likewise being disapproved.

Again, in *Atlantic Coast Line Railroad Co.*, 4 T.C. 140, we held that a monthly accrual of an annual tax consistently adhered to should not be disturbed even though some of the months would fall into the following year. There (p. 151) we quoted with approval from *Commissioner* v. *Schock, Gusmer & Co.*, (C.A. 3) 137 F. 2d 750—

that both of the New Jersey taxes under consideration would in the normal course be treated as part of such overhead expense, not for the year *in* which they were assessed but for the year *for* which they were assessed. And if a taxpayer kept his books on a monthly accrual basis as the taxpayer did here, he would normally and naturally accrue his state property taxes in twelve equal monthly installments.

This uncertainty and capriciousness in what should be a rational and purely practical area is not alleviated by the fact that *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180, was decided as it was by only 5 of the 9 justices, and one cannot but be struck by the aptness of the statement by Mr. Justice Harlan, speaking for 3 dissenting justices, that: "[T]he Commissioner does not deny—as,

indeed, he could not—that the method of accounting used by the taxpayer reflects its net earnings with considerably greater accuracy than the method he proposes."

If we were a free agent I would accordingly dissent from any conclusion that we should disturb the taxpayer's consistent practice in the absence of more convincing evidence than we have that this would result in any real, or at least avoidable, distortion of income over the long term.

But the question has already been passed on. *Automobile Club of Michigan* v. *Commissioner, supra.* I see no possible ground for distinguishing the method of accounting used by petitioner from that employed by the Automobile Club of Michigan. Furthermore, our decision in that case, 20 T.C. 1033, has been affirmed by the Court of Appeals for the Sixth Circuit, 230 F. 2d 585. The implication, at least, is that there is a conflict between the affirming opinion and *Bressner Radio, Inc.* v. *Commissioner*, (C.A. 2) 267 F. 2d 520, reversing 28 T.C. 378, decided in the circuit to which this case will go on appeal.[1]

But I disagree with my brother Pierce that for this reason we should follow the latter circuit. It seems to me, as a unified and integrated administrative court, the Tax Court is obligated by the geographical uniformity provisions of the Constitution, article I, section 8, clause 1, *Flint* v. *Stone Tracy Co.*, 220 U.S. 107, to decide identical questions the same way regardless of where in the United States the taxpayer happens to reside. To say that a corporation doing business in Michigan shall be treated in exactly the opposite way, under the same circumstances and under identical tax provisions, from a corporation doing business in New York strikes me as a position which the Tax Court should not be called upon to attempt to defend.

I accordingly concur in the result on the authority of the *Automobile Club of Michigan* v. *Commissioner, supra.*

---

DRENNEN, *J.*, concurring: I agree that *this case* does not warrant modification of or deviation from the long-established rule that prepaid income is taxable in the year received provided such income is subject to unrestricted use by the taxpayer. For that reason, I do not think the discretionary action of the Commissioner in determining under section 41 of the 1939 Code that this taxpayer's method of accounting did not clearly reflect its income "exceeded permissible limits," as said by the Supreme Court in *Automobile Club of Michigan*

---

[1] "The Commissioner urges that in any event *Automobile Club of Michigan* v. *Commissioner, supra*, establishes the applicability of the so-called 'claim of right' doctrine to disallow deferrals of these unearned receipts. While this was true of the decision in the Tax Court * * * and apparently of the decision in the Court of Appeals * * *"

v. *Commissioner*, 353 U.S. 180. However, I do not agree that the general rule can be applied by the Commissioner in all cases and under all circumstances, absent only some "special regulation or exceptional statutory provisions." I think there might be situations where a taxpayer's method of accounting for income received, which does not conform to the general rule, would correctly reflect his income and that it would be exceeding the limits of discretion accorded the Commissioner in section 41 to either correct items within petitioner's system of accounting or require a different system of accounting. I agree with Judge Pierce that the rule is not inflexible, but I believe the circumstances in which it would not be applicable would have to be quite unusual.

We found in *Automobile Club of Michigan*, 20 T.C. 1033, that the taxpayer's method of accounting did not clearly reflect its income and accordingly that the Commissioner did not err in so determining. I see nothing in the facts in this case to justify reaching a different conclusion here. The pro rata allocation of membership dues in monthly amounts is as artificial and unrelated to the services petitioner may be called upon to render in this case at it was in that case, and I think this finding is implicit in the conclusion of the Court here.

I do not think this conclusion is contrary to the settled views of the Court of Appeals for the Second Circuit as expressed in *Bressner Radio, Inc.* v. *Commissioner*, 267 F. 2d 520, reversing 28 T.C. 378, as Judge Pierce seems to think. The Court of Appeals in that case expressly distinguished the *Automobile Club of Michigan* case, but I do not think the case before us can be so distinguished.

WITHEY, *J.*, agrees with this concurring opinion.

---

PIERCE, *J.*, dissenting: The Court's opinion on the first issue of the instant case has brought to the forefront again two questions of major importance in the operation of our Federal income tax system, on which the positions taken by this Court appear to be out of harmony with the weight and trend of Courts of Appeals' authority. These questions are:

1. Whether, under the accrual method of accounting, amounts received in one taxable year which are admittedly the price of services to be performed in future years, *must as a matter of law* be included in taxable income *only* in the year when *received;* or whether such advance payments may, when handled in accordance with sound business accounting principles, be accounted for in the respective years when *earned*.

2. Whether, if the Court of Appeals for a particular circuit has decided a question of law (such, for example, as the question above

mentioned) in such manner and at such time as to leave no doubt as to its present position, the Tax Court should, in deciding the same question of law in a case wherein its decision will (unless otherwise stipulated by the parties) be subject to review by said particular circuit, follow the settled law of such circuit.

My dissent from the majority opinion in the instant case is directed to the positions therein taken with respect to each of the above questions.

## I.

(A) As regards the first of said questions, this Court in deciding the first issue of the instant case, relied on a so-called "established rule" which it had developed and consistently applied in numerous other cited cases. It said: "[W]here there is actual receipt and the funds are at the unrestricted disposal of the taxpayer, as is the case here, all the events have already occurred that call for accrual"; and it further said more specifically: "An item of income cannot accrue for tax purposes *after* it has in fact been received subject to the unrestricted use of the taxpayer. Income may accrue prior to receipt, but not subsequent thereto." (Emphasis is the Court's.)

Such "established rule" is, in substance, an application of the so-called "claim of right" doctrine to the accrual method of accounting—although it was not here, as it was in several of the cited cases, so *labeled.* The following review of several of said cited cases reveals not only that such "established rule" actually is based on the "claim of right" doctrine, but also that this Court's application of such "rule" is absolute and inflexible—even when such application conflicts with sound business accounting practice.

Thus, in *Krim-Ko Corporation,* 16 T.C. 31 (1951), wherein an accrual basis taxpayer had received advance payments for advertising services to be rendered in subsequent years, this Court said:

Having been received under *claim of right* and without restriction as to disposition, they constitute income in the year of receipt or accrual notwithstanding that Krim-Ko or its successor might in later years make refunds or expenditures with respect to them. [Emphasis supplied.]

Also in *Curtis R. Andrews,* 23 T.C. 1026 (1955), which is twice cited in the Court's Opinion herein, the nature and inflexibility of such "established rule" is even more clearly shown. There a dancing school which employed the accrual method of accounting, received advance payments from students as the price for dancing lessons to be given over more than 1 year. This Court said:

the partnership's accounting system may well have "clearly reflected income" according to generally accepted commercial accounting practice. However, accounting practice must bow to established rules of law in the determination of taxable income. The *"claim of right" doctrine* is firmly established and must

govern the result herein. We agree with the dissenting [rather than the majority] opinion in *Beacon Publishing Co.* v. *Commissioner* * * * . [Emphasis supplied.]

Likewise, in *E. W. Schuessler*, 24 T.C. 247 (1955), revd. 230 F. 2d 722 (C.A. 5, 1956), wherein advance payments were received for personal services to be rendered over a 5-year period, this Court said:

We agree that the principle upon which the *Andrews* case [quoted above] was decided *is not in harmony with generally accepted commercial accounting practices;* but, on the other hand, a contrary result, such as the one reached in the *Beacon Publishing Co.* case [C.A. 10] does not appear to us to conform to the firmly established *"claim of right"* doctrine governing the receipt of income and its taxability in the year in which received. * * * [Emphasis supplied.]

(B) Several of the Courts of Appeals have reversed the Tax Court in cases dealing with advance payments for future services. They have indicated that, with proper accounting, portions of advance payments received in one period by an accrual basis taxpayer may be taken into income in subsequent periods; and that *sole* emphasis should not be placed on the *receipt* of the money. *Bressner Radio, Inc.* v. *Commissioner*, 267 F. 2d 520 (C.A. 2, 1959), reversing 28 T.C. 378; *Bayshore Gardens, Inc.* v. *Commissioner*, 267 F. 2d 55 (C.A. 2, 1959), reversing 30 T.C. 1292; *Schuessler* v. *Commissioner*, 230 F. 2d 722 (C.A. 5, 1956), reversing 24 T.C. 247; and *Pacific Grape Products Co.* v. *Commissioner*, 219 F. 2d 862 (C.A. 9, 1955), reversing 17 T.C. 1097. See also *Harrold* v. *Commissioner*, 192 F. 2d 1002 (C.A. 4, 1951), reversing 16 T.C. 134. Some of these cases dealt with a situation where the taxpayer's regular accounting practice was to defer taking into income, portions of advance payments received for future service; and others dealt with a situation (which in reality is the opposite side of the same coin) where the taxpayer's regular accounting practice was to set up a reserve in the year of receipt, to meet the estimated costs of rendering the services for which the advance payments admittedly were made.

No detailed review of the above Courts of Appeals' cases is here presented, for their import can best be gathered from reading them in their entirety. It appears sufficient to state here that, while each case deals with different facts and approaches the general problem from a somewhat different viewpoint, all are consistent with one another. Emerging from these cases, when considered collectively, are the following principles:

1. That the "claim of right" doctrine has no proper application to the present problem of determining *when* advance payments of *undisputed* income should be subject to tax.

2. That the purpose of Congress, in authorizing the use of the accrual method of accounting, was to bring tax accounting into closer

harmony with recognized methods of business accounting;[1] and thus to permit a clearer reflection of income than had been possible when sole emphasis had been placed on the time of receipts and the time of disbursements.

3. That sections 42 and 43 of the 1939 Code, which define the periods in which items of gross income shall be included and in which deductions and credits may be taken, are sufficient to provide the flexibility which Congress intended to make possible under the accrual method of accounting.[2]

4. That permitting deferral of advance payments does not involve interference with the Commissioner's broad discretion to require that taxpayers' accounting methods shall clearly reflect income. It represents, rather, judicial correction of the Commissioner's action in improperly applying a legal principle.

5. That any "rule" which requires advance payments for future services to be accrued in their entirety *solely* in the year of receipt, places undue emphasis on the *receipt* of the money; and in effect, it compels use of a hybrid system composed partly of the cash receipts method and partly of the accrual method. Such hybrid system may not clearly reflect the income.

6. That established accounting systems based on sound accounting principles, under which advance payments are deferred, should not be disapproved solely because they do not conform to the Commissioner's application of the "claim of right" doctrine.

---

It is significant that in the *Pacific Grape Products Co.* case, *supra*, several Judges of the Tax Court expressed impatience with the application of inflexible rules, to upset long-established business accounting systems. Judge Opper, in his dissenting opinion in which five other Judges concurred, said (17 T.C. at 1110–1111):

The practice of disapproving consistent accounting systems of long standing seems to me to be exceeding all reasonable bounds. * * * Methods of keeping records do not spring in glittering perfection from some unchangeable natural law but are devised to aid business men in maintaining sometimes intricate accounts. If reasonably adapted to that use they should not be condemned for some abstruse legal reason, but only when they fail to reflect income. There is no persuasive indication that such a condition exists here. On the contrary, a whole industry apparently has adopted the method used by petitioner.

[1] H. Rept. No. 922, 64th Cong., 1st Sess., 1939–1 C.B. (Part 2) 22–24.

[2] Section 42, after providing *generally* that all items of gross income shall be included for the taxable year in which received, *further provides:* "[U]nless, under methods of accounting permitted under section 41 [which includes the accrual method]₁ any such amounts are to be properly accounted for as of a different period."

Similarly section 43, after providing *generally* that deductions and credits shall be taken for the year in which "paid or accrued" or "paid or incurred," *further provides:* "[U]nless in order to clearly reflect the income the deductions or credits should be taken as of a different period."

It will not do to say that respondent should not have disturbed petitioner's accounting method, but that since he has done so, we are powerless to do otherwise. As long as we continue to approve the imposition of theoretical criteria in so purely practical a field, respondent will go on attempting to seize on such recurring fortuitous occasions to increase the revenue, even though he may actually accomplish the opposite. * * * I think it evident that petitioner's generally recognized accounting system did not distort its income and that it should be permitted to continue to use it. * * *

The above dissenting opinion was approved and quoted in full by the Ninth Circuit, in its reversal of the majority opinion; and said court further said:

Not only do we have here a system of accounting which for years has been adopted and carried into effect by substantially all members of a large industry, but the system is one which appeals to us as so much in line with plain common sense that we are at a loss to understand what could have prompted the Commissioner to disapprove it. * * *

This statement of the Ninth Circuit was thereafter quoted with approval by the Fifth Circuit in the *Schuessler* case, *supra.*

Also, Roswell Magill who is one of the outstanding authorities on Federal income taxation, has indicated disagreement with the accrual in a single year, of amounts which are admittedly the price of services to be performed in future years. In his treatise, entitled "Taxable Income" (rev. ed. 1945) at pages 201–202, he said:

The receipt of the money in a given year satisfied only half the statutory requirements; it remains to inquire whether, under accrual accounting, it should properly be accounted for in later years. * * *

* * * Thus, an insurance company collects a premium in one year for insurance with a three-year term. The premium can hardly be regarded as earned in the year of collection, so the company reports only one-third of it as income in that year. Nevertheless, the relatively few cases which have involved the point have held the income to have been realized in full in the first year. [Earlier cases cited in footnote.] These decisions put an undue emphasis upon the receipt of the money, an element which is the basic test of income under a cash receipts method, but which ought not to be under an accrual method. It is evident that such decisions, which would apparently treat a $1,000,000 down payment on a fifty-year lease as income in the year of receipt, lead to a gross and, it seems, quite unnecessary distortion of income. Moreover, they are inconsistent with the decisions denying to the lessee, on these facts, a deduction of $1,000,000 at the time the lease was made, and requiring him to prorate the deduction over the life of the lease. No controlling administrative reason for this bird-in-hand policy has yet been set forth; the inequities of the present decisions seem to overbalance the probable loss of revenue from some future insolvencies of taxpayers who have prorated these cash receipts.

(C) The Supreme Court had an opportunity to pass upon the instant problem in *Automobile Club of Michigan* v. *Commissioner*, 353 U.S. 180; but it did not do so. There, both the Tax Court (20 T.C. 1033) and the Court of Appeals for the Sixth Circuit (230 F. 2d 585) had based their decisions on an application of the "claim

of right" doctrine. But, as the Second Circuit aptly pointed out in *Bressner Radio, Inc., supra*: "[T]he decision of the Supreme Court was placed on the far narrower ground that the particular method of deferral adopted by the Club was unsatisfactory." Likewise, Mr. Justice Harlan, in his dissenting opinion in which two other justices concurred, said: "The Court, however, now by-passes the Commissioner's 'claim of right' argument, and rests its decision instead on the ground that the 'pro-rata allocation of the membership dues in monthly amounts is purely artificial * * *.'"

Moreover, it seems apparent that if the Supreme Court had believed, as did the Tax Court in the instant case, that under the accrual method advance payments *must as a matter of law* be included in income *solely* in the year of receipt, irrespective of the business accounting system employed—then the Supreme Court's footnote 20, in which the particular accounting system in the *Beacon* and *Schuessler* cases were distinguished, would have been unnecessary.

Thus it appears that the present question is an open one, so far as the Supreme Court is concerned.

(D) Based on all the foregoing, I believe that this Court in deciding the first issue of the instant case, erred in applying its inflexible "established rule" based on the "claim of right" doctrine; and that the present question of law, which is the *threshold* to any consideration of the petitioner's particular method of accounting, should have been decided in favor of the petitioner.

Thereafter, if the Court believed that any question regarding the adequacy of petitioner's particular method of accounting was properly before it, it should have decided such secondary question, and should have developed the facts and reasoning to support its conclusion. See *Gilbert* v. *Commissioner*, 248 F. 2d 399 (C.A. 2), reversing a Memorandum Opinion of this Court; *MacCrowe's* v. *Commissioner*, 264 F. 2d 621 (C.A. 4), vacating and remanding 30 T.C. 653.

## II.

The second ground for my dissent from the Court's opinion on the first issue of the instant case, is that this Court failed to follow the settled law of the Court of Appeals for the controlling circuit.

On May 28, 1959, as hereinbefore pointed out, the Court of Appeals for the Second Circuit decided *Bressner Radio, Inc.* v. *Commissioner*, 267 F. 2d 520, reversing 28 T.C. 378. In said case, that court defined the question presented and described the actions thereon of the Commissioner and the Tax Court, as follows:

The petition presents the question * * * whether or in what circumstances a taxpayer who has long employed the accrual method of accounting may defer the inclusion in income of prepaid revenues on contracts to render future services over a twelve month period subsequent to the date of receipt. The Com-

missioner asserted a deficiency * * * on the ground that "the method employed does not clearly reflect the income" of petitioner, § 41, Internal Revenue Code of 1939, and demanded the inclusion of all revenues in gross income in the year of receipt in place of the taxpayer's pro-rata monthly deferral. The Tax Court agreed with the Commissioner * * *

The Second Circuit then reviewed extensively the statutes and authorities bearing on the problem; and it made the following holdings:

the petitioner's "true income" would be distorted by the inclusion of the entire receipt in its year's revenues [when received].

\* \* \* \* \* \* \*

with the sole exception of *Automobile Club of Michigan* v. *Commissioner, supra,* not one of these cases [pertaining to the "claim of right" doctrine] deals on the merits with the question of the propriety of the deferral of prepaid receipts, held without other restriction as to use than the liability to perform future services on demand. * * *

\* \* \* \* \* \* \*

It is apparent from the decision of the majority [of the Supreme Court in said *Automobile Club* case] that at least for purposes of the decision of the case it assumed that a realistic deferral would have been permissible, and found only that no realistic deferral was made. It thus did not pass on the issue which concerns us here. * * *

\* \* \* \* \* \* \*

Therefore there is no basis whatever in the cited cases for the Commissioner's broad assertion that for tax purposes concededly unearned receipts must be regarded as income in the year of receipt, and there is nothing to indicate that in construing §§ 41 and 42 and their predecessors the Supreme Court has generally departed from the standard of sound accounting practice in determining what methods are authorized under § 41. * * *

\* \* \* \* \* \* \*

In conclusion, petitioner's regularly employed method of accounting on an accrual basis and its deferral of income so that it most closely matched the corresponding expenses clearly reflected its true income. * * *

The opinion was unanimous; and the decision of the Tax Court was reversed.

On the following day, May 29, 1959, the same court (composed this time of three different judges) decided *Bayshore Gardens, Inc.* v. *Commissioner,* 267 F. 2d 55, reversing 30 T.C. 1292. There, the taxpayer had received payment of a premium on a 32-year mortgage loan, which it sought to amortize over the period of the loan. The court stated that the Commissioner's argument, was "that because the taxpayer received the amount in question under a claim of right and without a restriction as to its disposition, it was income reportable when received." The court thereupon rejected this argument, and sustained the right of the taxpayer to spread the income. Here again, the opinion was unanimous; and the decision of the Tax Court was reversed.

Notwithstanding the two above-mentioned decisions of the Second Circuit, and notwithstanding that any appeal from the Tax Court's decision in the instant case lies within the jurisdiction of that circuit, this Court decided the first issue in reliance upon its so-called "established rule" which is based on the "claim of right" doctrine. There can be no doubt that the position taken by this Court in the instant case is in direct conflict with the position of the Second Circuit in the *Bressner* case, *supra*.

Two Courts of Appeals have recently admonished this Court, in no uncertain terms, that its duty is to follow the settled law of the controlling circuit. *Stacey Mfg. Co.* v. *Commissioner*, 237 F. 2d 605 (C.A. 6, 1956); *Sullivan* v. *Commissioner*, 241 F. 2d 46 (C.A. 7, 1957). In the *Stacey* case, the Sixth Circuit said:

the Tax Court of the United States is not lawfully privileged to disregard and refuse to follow, as the settled law of the circuit, an opinion of the court of appeals for that circuit. If the tax court is not bound on questions of law by decisions of the appropriate circuit having jurisdiction, why should any jurisdiction be vested in circuit courts of appeals to review decisions of the tax court? The district courts of the several circuits also have statutory jurisdiction in tax cases and they are bound to follow the rules of decision pronounced by the United States Court of Appeals having appellate jurisdiction over the particular district court. The tax court is no less bound to do so. The mere fact that it is a court having jurisdiction in tax cases throughout the United States does not establish the tax court as superior in any aspect to United States District Courts.

The desire of the tax court to establish by its decisions a uniform rule does not empower it to disregard the decisions of its several reviewing courts of appeals. It is for the Supreme Court of the United States—and for that tribunal alone—to review and reverse decisions of the courts of appeals of the United States in their respective jurisdictions. Until the Supreme Court reverses ₽ rule by a court of appeals for its circuit, that rule must be followed by the tax court.

The statement of the Seventh Circuit, in the *Sullivan* case, *supra*, is to the same effect. No contrary statement of any appellate court has been found.

The instant case does not present a situation, where the controlling circuit has not expressed its views on the particular question involved, or where a decision of the controlling circuit on such question is so old or so indefinite that the circuit's current position may be subject to reasonable doubt. Rather, the situation here presented is one where the controlling circuit has very recently considered, reviewed, and passed upon the identical question which the Tax Court has now decided in a contrary manner.

I believe that this Court, in deciding the first issue of the present case, should have followed the settled law of the Second Circuit. And I further believe that, at least as to situations like the present, the views heretofore expressed in *Arthur L. Lawrence*, 27 T.C. 713

926

(1957), reversed on other grounds 258 F. 2d 562 (C.A. 9), should be modified.

This is not to say that, if in a particular case this Court's views are contrary to those of the controlling circuit, it may not properly state that its decision in such case will not be regarded as a precedent. It is my conviction, however, that under our judicial tradition this Court should not substitute its own views for the contrary settled views of the Court of Appeals for a controlling circuit.