P. F. Scheidelman & Sons, Inc. v. Commissioner.
P. F. Scheidelman & Sons, Inc. v. Commissioner
Docket Nos. 90022, 92327, 4324-62.
United States Tax Court
T.C. Memo 1965-31; 1965 Tax Ct. Memo LEXIS 298; 24 T.C.M. (CCH) 168; T.C.M. (RIA) 65031; February 17, 1965
*298 1. In 1954 petitioner issued 4 1/2 percent notes in redemption of its seven percent cumulative preferred stock. A maximum of 10 percent of the principal was payable annually on demand. The corporation reserved the right to prepay the notes in whole or in part. The notes were not subordinated to other creditors, interest and principal were unconditionally payable, and the notes were completely paid within five years of issuance. Petitioner paid and claimed deductions for interest during the period the notes were outstanding. Respondent disallowed such deductions. Held: That the notes represented indebtedness within the meaning of sec. 163 of the Code [1] and the interest paid was deductible. 2. Petitioner received loans from its shareholders, a relative of the shareholders and a corporation owned by two shareholders from 1955 through 1959. No notes were issued for such loans but it paid interest at 4 1/2 percent and repaid all amounts advanced. The loans by any shareholder were not proportionate to his stock ownership and the petitioner's ratio of equity to shareholder debt was reasonable. *299 Respondent disallowed interest paid by petitioner on the loans. Held: That the loans represented indebtedness within the meaning of sec. 163 of the Code and interest paid thereon was deductible. 3. Beginning in 1956, petitioner sold "IOU" trading stamps to its customers and provided for redemption thereof. It included 25 percent of the sales proceeds in income and established a reserve for redemption with the remaining 75 percent. The latter amount was actually deposited in petitioner's general checking account through which corporate expenses were paid. Petitioner excluded 75 percent of each sale from gross income, but respondent included such amounts. Held: That the entire stamp sales proceeds were includable in petitioner's gross income under sec. 61(a) of the Code. 4. In 1959, petitioner's board of directors authorized its treasurer to pay each of its three officers a maximum of $100 per week for general promotion of its business. Petitioner deducted the amounts paid in 1959 and 1960 as travel expenses. Respondent disallowed portions of the deductions and petitioner claimed the disallowed portions were deductible as compensation. Held: That the disallowed expenses were not *300 deductible as compensation under sec. 162 of the Code. Richard O'C. Kehoe, for the petitioner. Stephen M. Miller, for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: * Respondent *301 determined deficiencies in petitioner's income tax as follows: Year
Amount
1955
$ 3,156.74
1956
10,669.04
1957
12,568.93
1958
3,926.40
1959
5,164.73
1960
3,728.97 Four issues involved in respondent's determinations remain for decision, each of which will be considered independently. General Findings of Fact Some facts are stipulated and are found accordingly. P. F. Scheidelman & Sons, Inc. (hereinafter referred to as petitioner or corporation) is a New York corporation with its principal place of business in Utica, New York. It is in the business of selling beer and groceries at wholesale. Petitioner operates its business and files its Federal income tax returns on the basis of a fiscal year ending October 31. Its returns for the years in question were filed with the district director of internal revenue, Syracuse, New York. These returns were computed on the accrual basis. Issue I Whether notes issued by the petitioner in redemption of its preferred stock represent indebtedness within the meaning of section 163 of the Code. Findings of Fact Petitioner's authorized *302 capital stock consists of 500 shares of $100 par value cumulative preferred stock and 500 shares of $100 par value common stock. The terms of such common and preferred stock include the following: (a) Holders of preferred stock are entitled to cumulative dividends at the rate of $7 per year, or seven percent of the amount of par value for each and every year of the corporation's existence; (b) any dividend arrearages on the preferred shares must be paid in full before dividends can be paid on common shares; (c) if the corporation fails to earn or pay the dividend referred to in (a) for five successive years, each share of preferred stock, at the expiration of such fiveyear period, has the same voting rights as each common share, i.e., one vote for each share. Between December 10, 1925, and January 13, 1930, 200 shares of the preferred stock were issued to P. F. Scheidelman, one of the original incorporators, and 109 shares were issued to various other individuals who were not actively participating in the management of the business. Dividends were paid on the outstanding preferred stock starting in fiscal 1927 and continuing through fiscal 1942. The total annual amount of such *303 dividends ranged between $2,493.75 and $848.75. No dividends have been paid on the preferred shares since October 31, 1942. By 1941 the afore-mentioned 109 shares of preferred stock had been redeemed for full or par value and were being carried as treasury stock on the books of the corporation. Sixty of the 200 preferred shares originally issued to P. F. Scheidelman were redeemed by the corporation by 1941. However, by the end of 1941 the 169 treasury shares had been reissued and the remaining 191 previously unissued preferred shares had been issued. Following the issuance of additional shares and the transfer of shares between 1941 and December 31, 1954, the shares of the corporation's preferred and common stock outstanding on the latter date were as follows: Name
Relationship
John C. Scheidelman
Son of P. F. Scheidelman
Leroy C. Scheidelman
Son of Leroy H. Scheidelman
Madeline Scheidelman
Wife of John C. Scheidelman
Hazel Scheidelman
Wife of Leroy H. Scheidelman
Ronald Scheidelman
Son of Leroy H. Scheidelman
Elizabeth S. Droz
Daughter of Leroy H. Scheidelman
DeLos Scheidelman
Son of P. F. Scheidelman
Warren Scheidelman
Son of DeLos Scheidelman
Leroy H. Scheidelman
Gladys S. Heintz
Daughter of P. F. Scheidelman
Treasury
*304 Name
Shares
Position
Preferred
Common
John C. Scheidelman
President
122
142
Leroy C. Scheidelman
Secy.-Treas.
since 1957
79
71
Madeline Scheidelman
None
81
0
Hazel Scheidelman
None
40
57
Ronald Scheidelman
None
79
41
Elizabeth S. Droz
None
66
0
DeLos Scheidelman
None
0
58
Warren Scheidelman
Vice-Pres.
since 1957
0
19
Leroy H. Scheidelman
Secy. Treas.
since 1957
0
83
Gladys S. Heintz
None
0
0
Treasury
33
29
Total
500
500 No dividends have ever been paid on the corporation's common shares. The corporation's books and records indicate the following account balances for the fiscal years 1941 through 1960: F/Y/E
Oct. 31
Cash
Total Assets
Total Liabilities
Earned Surplus
1941
$ 2,172.78
$243,964.04
$ 87,907.01
$ 56,057.03
1942
8,170.62
217,444.71
46,882.84
70,561.87
1943
4,134.46
215,051.08
23,787.98
91,263.10
1944
15,962.48
263,214.20
44,507.76
118,706.44
1945
Record Not Available
1946
6,926.60
318,430.39
68,558.43
149,871.96
1947
Records Not Available
1948
4,726.00
302,807.29
50,400.57
152,406.72
1949
Records Not Available
1950
4,932.96
330,797.53
93,642.52
137,155.01
1951
342.82
390,243.16
149,560.75
145,882.41
1952
4,472.83
370,063.16
120,680.50
154,582.66
1953
18,961.19
514,817.42
246,414.67
168,602.75
1954
52,611.50
500,654.28
219,111.07
189,743.21
1955
6,941.17
560,436.98
325,861.37
212,825.61
1956
5,721.05
590,993.20
333,637.58
235,605.62
1957
12,794.95
657,806.88
369,720.17
237,460.05
1958
558.87
675,078.69
356,683.39
267,768.64
1959
2,465.67
658,652.13
304,399.19
298,626.28
1960
1,150.85
783,617.33
392,585.25
335,405.42
*305 The corporation had sufficient earned surplus in each year during the period beginning October 31, 1942, and ending October 31, 1954, to meet the annual seven percent dividend on the outstanding preferred stock. The corporation had sufficient cash to pay such dividends in each year for which records are available during the period except 1951. At a special meeting on December 4, 1954, the corporation's board of directors proposed to offer to purchase its outstanding preferred stock. The minutes of the meeting state: The object being to put the common stockholders in complete control of the operation of the business, and eliminate the liability of 7% dividend which is now in default on preferred stock. The corporation's letter of December 15, 1954, to the shareholders offered to purchase the preferred stock at $150 per share through issuance of nonnegotiable demand notes bearing 4 1/2 percent interest, with a maximum of 10tion percent of the principal taxable on demand each year. The corporacipal [*] on demand each year. The corporation reserved the right to completely or partially pay the notes in advance. As an alternative, the corporation offered to purchase any preferred *306 shares for cash at $135 per share. By the date of termination of the offer, December 30, 1954, the owners of all preferred shares had accepted the offer of $150 per share, and notes dated December 31, 1954, were received by them on the above terms in exchange for their shares. The amounts of the notes were as follows: Name
Shares
Amount
John C. Scheidelman
122
$18,300
Leroy C. Scheidelman
79
11,850
Madeline Scheidelman
81
12,150
Hazel Scheidelman
40
16,000
Ronald Scheidelman
79
11,850
Elizabeth S. Droz
66
9,900
Total
467
$70,050
Dividend arrearages on the preferred stock as of December 31, 1953, were in excess of $50,000. The difference between the redemption price of $150 and the par value of $100 was treated by the petitioner as a premium paid on retirement of the preferred stock which reduced its earned surplus. Following the exchange of preferred stock for notes of the corporation, the three officers of the corporation, John C. Scheidelman, Leroy C. Scheidelman and Leroy H. Scheidelman, and an individual who became an officer in 1957, Warren Scheidelman, owned 315 of 471 outstanding voting shares, or 66.88 percent; prior to the exchange *307 these individuals owned 516 of 938 voting shares, or 55 percent. Ultimate Finding of Fact The notes issued by the corporation in redemption of its preferred stock represented indebtedness within the meaning of section 163 of the Code. Opinion Issue I The first issue is whether amounts paid as interest on notes issued by the petitioner in exchange for its preferred stock are deductible under section 163[2] of the Code. The amounts of interest involved are: Year
Amount
1955
$2,250.57
1956
1,975.23
1957
1,583.54
1958
1,288.13
1959
1,075.18 Respondent does not deny that the payments were made, but he contends that the exchange of petitioner's prefererd stock by the owners thereof for its notes did not create an indebtdeness within the meaning of section 163, requiring disallowance of the interest deduction and resulting in a corresponding increase in petitioner's taxable income. Petitioner contends that *308 the notes did constitute indebtedness within the meaning of the section and payments are deductible as interest. The Supreme Court, in John Kelly Co. v. Commissioner, 326 U.S. 521, 530 (1946), in pointing out the proper approach to a case of this character, said, in part: There is no one characteristic, * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts. * * * All relevant factors must be considered and weighed in determining the answer. Clyde Bacon, Inc., 4 T.C. 1107 (1945). An analysis of the facts shows the presence of the following factors characteristic of an indebtedness: 1. The notes contained an unconditional promise to pay a fixed sum. 2. There was a fixed rate of interest that was payable regardless of the corporation's financial position. Furthermore, it is stipulated that interest was paid during the period in which the notes were outstanding. 3. The notes were not subordinated to other unsecured claims. Gilbert v. Commissioner, 248 F. 2d 399 (C.A. 2, 1957). 4. The corporation treated the notes as debts on its books. Entries therein *309 refer to "notes" and "interest." 5. The notes contained an ascertainable maturity date. Petitioner's pre-1957 secretary-treasurer on cross-examination agreed with respondent's contention that the notes contain no fixed maturity date. The test, however, is not limited to whether such a date is fixed. It may be satisfied by showing that the date is determinable or ascertainable on the date of the issuance of the notes. In Brown-Rogers-Dixson Co. v. Commissioner, 122 F. 2d 347, 350 (C.A. 4, 1941), affirming 42 B.T.A. 1479 (1940), the Court of Appeals said, in part: It has been repeatedly held that one of the fundamental characteristics of a debt is a definite determinable date on which the principal falls due. * * * See also 4 Mertens, Federal Income Taxation, § 26.10, at pp. 45-46 (Rev. Ed. 1960). In the instant case, a holder could have obtained annual payment of 10 percent of the principal amount by notice to the corporation 30 days prior to each semi annual interest date. Thus, the date at which any of the notes would finally be paid could have been determined *310 as 10 years from the first interest date. In support of this view, see Commissioner v. Proctor Shop, Inc., 82 F. 2d 792 (C.A. 9, 1936) affirming 30 B.T.A. 721 (1934), in which the corporation involved bound itself to redeem monthly, beginning two months after issuance, certificates of $1,500 par value. The court found that this provision indicated a debt. Further supporting this view is United States v. Title Guarantee & Trust Co., 133 F. 2d 990 (C.A. 6, 1943), in which the court considered a promise by the corporation to redeem any "preferred shares" outstanding 20 years after issuance at par value plus accrued dividends "upon presentation and surrender of the certificates." In determining the instruments to be debt, the Court found that this provision resulted in a fixed maturity date. The corporation's obligation to pay "upon presentation and surrender" in United States v. Title Guarantee & Trust Co., supra, is similar to the obligation to pay on demand after 30 days written notice that is present in the instant case. The additional requirement of notice does not call for a different conclusion. Respondent, however, argues *311 that although the notes gave each holder the right to demand annual payments of 10 percent of the principal of his note, payment was subject to the discretion of the petitioner's board of directors and its secretary-treasuer. Thus, it is argued, the payments would be made only if these individuals believed that such payments would not be detrimental to the business. Respondent further argues therefrom that the funds were unconditionally placed at the risk of the business and should be considered equity rather than debt. Respondent points to the following exchange between Leroy H. Scheidelman and respondent's counsel as evidence of such collusion: Q: And payment [of the notes] was subject to the discretion of the Board, was it not? A: Yes. The witness earlier stated "I didn't want these people that had the notes to be able to push me into paying the money unless the company had it to spare." However, other testimony of the witness shows that the previous statements could have referred to the provision for prepayment of the notes or could have been made to explain why the corporation did not want the entire principal payable on demand, rather than referring to the term requiring *312 the payment of 10 percent of the principal on demand each year. The witness testified: Q: Nor was there any fixed payment dates for the payment of principal? A: Well, the holders of the note had a right to demand 5 per cent on each payment date. We add that we do not think that the board of directors could have arbitrarily refused to cause the obligations of the company to be met, and the facts of record support the view that no arbitrary refusal was intended. If there was any evidence that the notes would not be paid on demand, cf. Security Finance & Loan Co. v. Koehler, 210 F. Supp. 603 (D. Kan. 1962), or an intention by the holders not to request payment, the picture might be different. But it has been stipulated that the full principal of the notes was paid within five years of issuance. See Associated Investors, Inc. v. United States, (D.C.Kan. 1956). The instant case may be distinguished in this regard from Finance & Investment Corporation v. Burnet, 57 F. 2d 444 (C.A.D.C. 1932), affirming 19 B.T.A. 643 (1930) on the ground that petitioner therein offered no evidence of any redemption. We have, of course, considered the criteria *313 which may support the view that the notes in question represent equity rather than debt. We do not think, however, that a detailed discussion is in order. Such factors include the following: 1. The notes were unsecured. In Graves Brothers Co., 17 T.C. 1499 (1951), acq: 1953-1 C.B. 4, however, the notes were unsecured and subordinated to all other legal obligations of the corporation (except those arising from its common and preferred stock). The Court held the notes to be debt. 2. The terms of the notes did not prevent the corporation from issuing other obligations having priority over the notes in question. In Commissioner v. H. R. Hood & Sons, Inc., 141 F. 2d 467 (C.A. 1, 1944), affirming 1 T.C.M. 262 (1943), the existence of such a power did not prevent the notes from qualifying as debt. 3. No new consideration was received by the corporation through the exchange. But see Sabine Royalty Corporation, 17 T.C. 1071 (1951) in which we said, in part (p. 1077): respondent points out "that the debentures were not issued for borrowed money" and did not "represent any new contributions to the capital." We did not *314 recognize this argument as determinative in the Lansing Community Hotel Corporation case, and repeat it here. * * * 4. There was no change in the management of the corporation after the redemption. However, the redemption did affect percentage changes in voting power. Furthermore, the absence of any change in control will not per se require a holding that the notes are not indebtedness. See Wilshire & Western Sandwiches, Inc. v. Commissioner, 175 F. 2d 718, 720 (C.A. 9, 1949). After careful consideration of all of the relevant facts, criteria, and indicia involved in this issue, we conclude that the notes represent a bona fide indebtedness within the meaning of section 163 of the Code, and that the interest paid was deductible. Issue II Whether interest paid on advances to petitioner is deductible under section 163 of the Code. Findings of Fact Petitioner's "Notes Payable" journal contained entries denoted "Bal. Notes" and "Additional Loans." The entries reflected advances to petitioner by Anna Weiman, Scheidelman, Inc., Hazel, John C., Leroy H. and Ronald Scheidelman. The initial entries showed the interest rate to be 4 1/2 percent, and the subsequent entries *315 of interest paid and payable were also computed at that rate. The advances occurred before and during the taxable years in issue. All advances were repaid by October 31, 1959. No notes were issued for the advances and no security was given. The advances were payable on demand. Petitioner's ratio of equity to debt during the years in question was never less than one to one, and in several of the years it was substantially higher. The ratio of advances by any shareholder to advances by all shareholders was disproportionate to that shareholders percentage ownership of the total number of petitioner's shares outstanding. Ultimate Finding of Fact Advances to the corporation gave rise to indebtedness within the meaning of section 163 of the Code. Opinion Issue II The second issue is whether advances to petitioner by its shareholders, by Anna Weiman (a sister of John C. Scheidelman) and by Scheidelman, Inc., a corporation owned by Leroy H. and John C. Scheidelman, constitute indebtedness within the meaning of section 163 of the Code. The amounts of interest involved are: Year
Amount
1955
$3,820.09
1956
4,781.92
1957
5,531.56
1958
3,527.30
1959
784.36
*316 The following characteristics of the advances are indicative of indebtedness: 1. Petitioner treated the advances as in-indebtedness in its records. 2. A reasonable rate of interest was paid. 3. The advances were repaid and all interest was paid. 4. The ratio of petitioner's equity to shareholder debt was reasonable. 5. The advances were not subordinated to other creditors. 6. The ratio of each shareholder's annual advances to the total annual advances, and the ratio of his total advances during the period to the total advances during the period, were disproportionate to his percentage of ownership of total shares outstanding. 7. Respondent contends that the advances had no fixed maturity date. However, petitioner's secretary-treasurer until 1957 testified that the advances were payable on demand and the Findings of Fact incorporate that statement. It is stipulated that the advances were repaid by the end of the last fiscal year in issue. The case of Security Finance & Loan Company v. Koehler, 210 F. Supp. 603 (D. Kan. 1962) is strikingly similar to the present issue. Involved therein were demand notes with interest payable thereon at six percent. The *317 Court found that there were no agreements among the holders of the notes not to enforce payment thereof and that payment had never been refused upon presentment. Defendant therein admitted that the notes had to be paid on demand of the holders. The Court found that the demand notes represented genuine indebtedness (p. 606): The advances were evidenced by notes and treated as loans on the books of the plaintiff, payments as interest were made semi-annually and the sums so received by the stockholders and their relatives were treated as interest in their individual income tax returns. There is no correlation between the advances as loans and the stockholdings as to amount or proportion; the payments on the advancements were not keyed to corporate earnings; the notes contained no provision whereby they would increase in amount of return through the prosperity of the corporation or by increase in the value of the stock. The holders of the notes had the right to receive interest regardless of corporation profits or losses while dividends paid to the stockholders fluctuated greatly. The factors supporting a finding that the advancements by the stockholders and their relatives actually *318 were loans far outweigh those which detract from such a finding when viewed in the light of the circumstances and the type of business engaged in by the plaintiff. * * * 8. The evidence supports the view that the advances were required for ordinary operating expenses. The corporation's sales during and the cash on hand at the end of each of the years in question were: Year
Sales
Cash
1955
$4,241.188.17
$ 6,941.17
1956
4,979,568.28
5,721.05
1957
6,456,213.70
12,794.95
1958
6,886,010.87
558.87
1959
7,699,183.39
2,465.67 The loans were obtained for the purpose of meeting the corporation's cash needs. On the other hand, the following factors may be indicative of equity: 1. No notes were issued for the advances. 2. Payment of interest was at times deferred. 3. The advances were unsecured. It should be noted, however, that petitioner's earned surplus increased from $235,605.62 on October 31, 1955, to $298,626.28 on October 31, 1959. After due consideration of all facts and circumstances involved herein, we hold that the advances represented indebtedness within the meaning of section 163 and interest paid thereon is deductible. Issue III *319 Findings of Fact In 1952 petitioner had established "Progressive Food Stores Cooperative Purchasing Plan." Under this plan retail grocers who were members of the program received a percentage of the profit which they helped petitioner earn by providing it with the opportunity to purchase in volume. This program continued during the taxable years in issue. In conjunction with this plan, petitioner provided free to members a weekly market letter and the services of an accountant and an engineer. It also organized group advertising and obtained manufacturers' cooperation in promoting store openings, anniversary sales and similar events. In 1952 petitioner began the "Thrifty Plan," which was a stamp plan similar to the one involved in the instant case. In 1954 it ended the "Thrifty Plan" and began the "Sav-a-Tape" plan. Under the latter plan a consumer's grocery receipts could be exchanged for premiums. During the summer of 1956, petitioner learned that some of its customers in Utica, New York, were contemplating the establishment of a trading stamp program whereby they would issue stamps to customers with their purchases and would then provide for redemption of the stamps. Petitioner *320 offered to administer the program, and its offer was accepted. Approximately 85 stores joined the program. The "Sav-a-Tape" plan was superseded by this program. The program was named the "IOU Stamp Program." Under the program, petitioner sold books of 5,000 stamps to members for $10 per book, or a cost of two mills per stamp. The maximum redemption value of the stamps in each book was $7.50, or one and one-half mills per stamp. The agreement between each member of the program and petitioner [sponsor] provided, in part: SPONSOR AGREES to operate the plan without profit and to set aside 10% for outside advertising and monthly statements shall be presented to the governing board. If member discontinues plan, SPONSOR AGREES to buy back all partially filled books for a period of sixty (60) days after withdrawal, at one (1) mill per stamp. SPONSOR RESERVES THE RIGHT to cancel out any member who, in sponsor's opinion, is not making progress with the program. * * *
There is a GOVERNING BOARD of five (5), including at least three (3) members, plus a Chairman representing sponsor, to guide and guard the operations. All major decisions shall be made by the governing board *321 and all members must abide by these actions. * * * Petitioner reflected the sale of each book of stamps in the following manner. Seventy-five percent of the sale proceeds, or $7.50, was added to an account labeled "Reserve for IOU Stamp Plan" and excluded from income. The remaining 25 percent was taken into income and the expenses of operating the plan were charged against this amount. Under this accounting procedure, petitioner's 1956 and 1957 Federal income tax returns showed losses from the program and its 1959 and 1960 returns showed gains from the program. [3] The following is a summary of the program during the years in question: F/Y/E October 31
1956
1957
1958
1959
1960
Sales
$19,370.00 *
$71,550.00
$59,650.00
$62,400.00
$67,615.00
Amount credited to
14,730.00
53,662.50
44,737.50
46,800.00
50,711.25
reserve during year
Reserve at end of
14,730.00
30,662.23
33,397.57
41,470.18
48,641.28
year
Percentage of year's
2.4% *
51%
70%
61%
51%
sales redeemed
*322 Taxpayer did not segregate the proceeds from the sale of the stamps from its other corporate funds. The entire proceeds were deposited in petitioner's general checking account and checks were drawn on the account for general corporate expenses. Bernard A. Lichtman, the owner of Lichtman's Super Market, joined the program on August 1956 and ended his membership in September 1960. He neither received nor requested a written accounting of the operation of the plan for all of the years in which he was a member, nor did he know of any profits from the program. He received no distribution of profits from the program. The total of the accounts payable and the amount in the reserve at the end of each year in issue always exceeded the total of cash on deposit and accounts receivable on hand at such times. Ultimate Finding of Fact The total receipts from the sale of stamps represented gross income to petitioner within the meaning of section 61(a) of the Code. Opinion Issue III The third issue is whether receipts from the sale of trading stamps pursuant to establishment of a trading stamp program is includable in petitioner's gross income under section 61(a)[4] of the Code. *323 Petitioner does not dispute includability of 25 percent of such receipts, nor does it challenge the years of includability, but it contends that the remaining 75 percent is not includable in its income. The amounts in question, which reflect the net annual increase in the reserve, are: Year
Amount
1956
$14,730.00
1957
15,932.23
1958
2,735.34
1959
8,072.61
1960
7,171.00
Respondent contends that the total receipts are includable in petitioner's income. Petitioner's argument is based on the theory that it had no economic interest in the disputed amounts and that it was only a conduit, agent or trustee through which the receipts flowed en route to their goal - transformation into premiums for the consumer. It points to the contract term requiring it to operate the program without profit as evidence that it will eventually have to return to its customers any portion of the reserve not required *324 for redemption. It further argues that this program was part of a continuing effort on its part to provide free services to its customers in order to increase its sales. Finally, it contends that several of its large customers were planning to inaugurate a stamp program for the purpose of profiting thereby, and that they would not have consented to petitioner's operation of the program unless they would receive any profits arising therefrom. Respondent replies that neither the terms establishing the program nor the execution thereof show petitioner to be an agent or a conduit. He points out that the disputed amounts were not segregated, but instead were deposited in petitioner's general checking account through which corporate expenses were paid; that there was no substantial evidence that petitioner ever made any distributions of profits or gave any accountings to its customers; that petitioner's customers differed as to whether and/or when distribution of profits was to occur; and that petitioner did not give notice to respondent of its alleged fiduciary relationship as required by statute. This issue is controlled by Automobile Club of New York, Inc., 32 T.C. 906 (1959), *325 affd. 304 F. 2d 781 (C.A. 2, 1962), in which taxpayer sold "savings plan coupons" to service stations and automobile accessory stores at face value, and these customers then distributed the stamps to petitioner's members in an amount equal to 10 percent of each member's purchases. Taxpayer would redeem the coupons from its members at any time, but its customers could obtain redemption of undistributed stamps only upon cancellation of their contract to purchase. The club excluded all such receipts from income and did not treat amounts paid in redemption as deductions. The receipts were not segregated from its general corporate funds, but were placed in the same bank account and were used for corporate purposes without restriction. Taxpayer maintained sufficient liquid assets to meet its obligation to redeem. Taxpayer first argued that it did not intend to profit from the sales. This Court answered, 32 T.C. 915: As was stated by the Court of Appeals in Fort Pitt Brewing Co., [20 T.C. 1, affd. 210 F. 2d 6 (C.A. 3, 1954)] "even though no trust is created, such a procedure of deposits and repayments is not designed for gain; *326 yet at times it may yield income. These characteristics are properly reflected in accounting and recognized in taxation." * * * The Court found that taxpayer's second contention, that it held the funds as a "trustee" for its members, was rebutted by the fact that petitioner used the funds for general corporate purposes. Although the agreement between petitioner and each of the program's members stated that the program was to be operated "without profit," it set forth no details for determining the times and amounts of any profit distributions. Moreover, although the reserve continued to grow during the period of 1957-1960 at a rate of 75 percent of sales despite the fact that average annual redemptions during this period were only 58.25 percent of sales, there was no evidence of distributions of the excess or of inquiries by members concerning distributions. Although petitioner's secretary-treasurer until 1957 testified that (a) the corporation intended to distribute periodically to members that portion of the reserve not required for redemption and (b) that it made a distribution of the 1.7 percent profit from the 1960 operation of the program, it introduced no evidence documenting *327 such distribution and this testimony was contradicted by the testimony of a member of the program, Bernard A. Lichtman. There was no evidence of concern by the members that petitioner was receiving the benefit of the earning power of the reserve. Although petitioner's witness testified that members had received a formal accounting in 1960, Lichtman testified that he had never received such an accounting. Krim-Ko Corp., 16 T.C. 31, 35 (1951). Such lack of concern by the members in the operation of the program leads to the conclusion that they would profit from the program only through increased sales of their goods. The testimony of Vincent J. Guzzardo, one of the original members of the program, supports this conclusion regarding the nature of the members' interest. Guzzardo stated: A: It wasn't this terrific profit in the stamp plan. We were looking primarily for profit plan. We were looking for a plan which would be competitive with other stamp plans and if we could only break even, we felt this would be a good deal. Even though the responsibility for "major decisions" was theoretically vested in the program's board of directors, in actual practice its duties *328 were very limited. Guzzardo stated in answer to a question about its duties: A: Well, we would have to - any new members had to - we had to agree to accept them. There wasn't much else to it. Furthermore, petitioner reserved the right "to cancel out any member of the program who, in sponsor's [petitioner's] opinion, is not making progress with the program." Such a power, combined with the "governing" board's duties, is inconsistent with petitioner's contention that it lacked interest in or control over the program. The Court's second reason in Automobile Club of New York, Inc., supra, is equally applicable here. Petitioner deposited the sales receipts in its general checking account and thus had the use of these funds in its business. This directly refutes petitioner's contention that it had no "economic interest" in the amounts, since it was using the funds in the production of its income in the years in question. Other factors point to petitioner's economic interest in the amounts and the absence of any obligation to use the amounts received only in the operation of the program. Thus, petitioner had the interest free use of the reserve in its business - a *329 significant factor in view of the corporation's cash requirements during the years in question. [5] Its economic interest in the amounts so retained is clear. At no time during the period in question did petitioner have on hand sufficient current assets - cash and accounts receivable - to meet its current liabilities - its obligation to redeem and accounts payable. The fact that it retained neither the cash received from the sale of the stamps nor placed sufficient cash in current assets to insure coverage of the redemption obligation militates against its contention that it was only holding the receipts in a suspended state. The nature of the obligation was such as to require any authentic conduit to keep the assets in liquid form. Even if petitioner maintained sufficient liquid funds to meet its current obligations, we would reach the same result under these facts, for petitioner has not established that he was required to hold the receipts in a state of suspension pending redemption. *330 See The Wayne Title & Trust Co. v. Commissioner, 16 T.C. 924, 929 (1951), affd. 195 F. 2d 401 (C.A. 3, 1952); Automobile Club of New York, Inc., supra, p. 911. Petitioner's reliance on The Seven-Up Co., 14 T.C. 965 (1950), and Broadcast Measurement Bureau, Inc., 16 T.C. 988 (1951) is misplaced. The former case is distinguishable on the grounds that (a) the receipts were burdened with an obligation to use them for a specific purpose and such obligation could be enforced in a state court. (b) The court found that the taxpayer retained sufficient liquid funds to meet the obligation in question. (c) Taxpayer did not use the funds for general corporate purposes. The latter case is distinguishable on the grounds (a) there was no possibility of gain to the taxpayer since it was required to return any excess. The instant taxpayer, however, could and did profit through the repurchase of partially filled stamp books from retiring members at one mill per stamp after the initial sale at two mills per stamp. (b) Taxpayer was incorporated as a not-for-profit corporation. (c) Use of the receipts for other than the required purposes *331 could be enjoined in a state court. Under the circumstances established in the record, we conclude that the entire stamp sales proceeds were includable in petitioner's gross income under section 61(a) of the Code. Issue IV Findings of Fact During 1959 and 1960 petitioner's officers were John C. Scheidelman, president; Warren Scheidelman, vice-president; and Leroy C. Scheidelman, secretary-treasurer. Schedule E, "Compensation of Officers," of petitioner's 1959 tax return showed the amounts paid these officers to be $8,957.72, $11,732.72 and $8,639.69, respectively. The amounts listed in this schedule in petitioner's 1960 return were $13,849.55, $11,625.40 and $12,732.14, respectively. In addition, the officers received as a group, $13,668.70 in 1959 and $15,600 in 1960. These amounts were deducted as "Travel Expense" on petitioner's 1959 return and as "Travel Expense-Officers" on its 1960 return. These amounts were paid pursuant to a resolution of the board of directors on December 15, 1959, authorizing the treasurer to pay each officer an amount not to exceed $100 per week for general promotion of the business. The board was then composed of petitioner's three officers. *332 The minutes indicate that petitioner's president stated that such promotional expenses took the form of business and social activities, such as hunting trips and summer weekends, and that often it was difficult to determine that portion of the activity allocable to business in order to obtain a corporation deduction therefor. He further stated that each officer was in a better position to deduct the proper portion of such expense on his individual tax return. Leroy H. Scheidelman, petitioner's secretary-treasurer until 1957, testified that these officers were completely in charge of petitioner's merchandising and financial policies and each worked 65 to 70 hours per week. He further stated that they were in charge of maintenance and operation of its equipment. A portion of the amounts labeled "Travel Expense" and "Travel Expense - Officers" was used for hunting trips, weekend trips and other social activities. Leroy H. Scheidelman was neither a stockholder nor an employee of petitioner during 1959 and 1960. Ultimate Finding of Fact The disallowed expenses here under consideration were not deductible as compensation under section 162 of the Code. Issue IV Opinion The *333 final issue is whether amounts disallowed as a deduction for travel expense are deductible under section 162[6] as compensation to officers. The amounts involved are $6,122 in 1959 and $11,772 in 1960. There are two questions which must be answered affirmatively in order to find in petitioner's favor: First, were the amounts intended as compensation for services; and, second, was the compensation reasonable in view of the services rendered? Maggio Bros. Co., 6 T.C. 999, 1004 (1946). Assuming, but not deciding, that the answer to the first question is affirmative, we must answer the second question in the negative because petitioner has failed to relate any officer's compensation to his services. *334 The burden of proving reasonableness is petitioner's. Shield Co., 2 T.C. 763 (1943). Petitioner argues that its officers had been grossly underpaid for several years in spite of constantly increasing sales because of a provision in its cooperative purchasing plan forbiding higher salaries for officers. It argues that their efforts justified greater compensation. Petitioner, however, failed to present credible evidence of reasonableness. The only testimony on the officers' efforts came from the corporation's former secretary-treasurer. On cross-examination, however, he stated that he was neither a stockholder nor officer nor director of petitioner in 1959 and 1960, that he did not know who had determined the officers' salaries in those years, but that he "knew what was going on." In view of the fact that the witness is closely related to and formerly worked with the officers, the testimony is subject to careful scrutiny. After weighing it carefully, we fail to find it dispositive. Petitioner has offered no further support for its position beyond pointing to an increase in sales. It failed to allocate the amounts in question to each of the officers so that it is impossible *335 for us to determine the amount received by each officer. It tailed to introduce evidence of each officer's duties, and it failed to show how the amounts received by each officer compared to compensation of officers having corresponding tasks in businesses of similar nature, complexity and size. It failed to explain why the directors' action came two and one-half months after the close of the 1959 fiscal year during which before-tax profit (but after deduction of the amounts involved here) rose to $62,041.65, a substantial increase over the 1958 profit of $51,684.57. Finally, we have tried and failed to draw some meaningful pattern from sales, profits and officers, compensation in petitioner's pre-1959 years in order to compare them with the same elements of the 1959 and 1960 business years. Nor have we been able to make a meaningful comparison of these elements for 1959 and 1960. The fact that the salaries of petitioner's officers were increased several times between 1954 and 1960 rebuts petitioner's contention that these allowances were in lieu of salary increases forbidden under the cooperative purchasing plan. Petitioner's reliance on Bell Oldsmobile, Inc., [*] 63,076, P-H *336 Memo. T.C., is misplaced, for there respondent stipulated that the excess allowances would not result in unreasonable compensation. W. Horace Williams Company v. Lambert, (U.S.D.C.E.D. La. 1956) is distinguishable by the amount and caliber of evidence introduced on the question of reasonableness. Under the circumstances, we must hold that the disallowed expenses were not deductible under section 162 of the Code. Decisions will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.↩
*. This report was prepared by Judge Fisher↩ during his tenure of office.
2. SEC. 163. INTEREST. (a) General Rule. - There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.↩
3. Petitioner's secretary-treasurer until 1957 testified that there was no profit from the program in 1959, but the 1959 return shows the following: I.O.U. Stamp Income, $15,599.55; I.O.U. Stamps purchased, $3,412.30; I.O.U. Stamps expense-office, $5,200 and Travel expense I.O.U. Stamp operation, $497.50. Although petitioner's 1960 return showed program expenditures, i.e., advertising and salesmen's salaries, unlisted in the return of the previous year, petitioner offered no evidence to show that part of the deductions in 1959 for these items under its general operations were properly allocable to the program.↩
*. The program did not begin until August 1956. ↩
4. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, - - -↩
5. For example, from 1956 through 1960 petitioner still had to borrow nearly $100,000 at 4 1/2 percent interest from shareholders, members of their families and a corporation owned by them.↩
6. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses * * * in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩